## MILTON C. GREER AND THOMAS A. DAVIS

### *vs.*

### FRANK WHALEN.

*Warranties*: *no express words necessary; province of jury; breach; waiver; what is not.*

To create an express warranty, the word "warranty" need not be used; nor is any precise form of expression required.

p. 279

Any affirmation of the quality or condition of the thing sold (not uttered as mere opinion or belief), made by the seller at the time of the sale, for the purpose of assuring the buyer of the truth of the fact affirmed, and inducing him to make the purchase, if so received and relied on by him, is an express warranty.                    p. 279

In the case of an oral contract, it is the province of the jury to decide as to the existence of these necessary ingredients of a special warranty, by considering all the circumstances attending the transaction; provided evidence adduced to show the facts was legally sufficient to be submitted to the jury.    p. 279

Upon a breach of warranty, the buyer may return the chattel, if delivered, within a reasonable time after discovering the breach, and recover, in the common counts, the amount paid. Or, he may retain the chattel and sue upon the contract for the damages resulting from the breach of warranty.          p. 280

Where A. had purchased cattle upon the assurance that they would be the same as he had been buying, and the cattle arrived at a station at some distance from A.'s farm, while he was absent on a trip South, the fact that his farm manager went for them and brought them to the farm, and the fact that A. had left a blank check for the cattle with an agent who filled in the amount for the bill, and delivered it to the vendors, did not operate as a waiver of a breach of the contract, when, as soon as A. returned and saw the cattle, he complained to the vendors of their condition, and requested them to take them off his hands.                             pp. 281-282

In such case, the question of the condition of the cattle sold is one for the determination of the jury.    .            p. 281

*Decided February 27th, 1915.*

Appeal from the Court of Common Pleas.    (DOBLER, J.)

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, PATTISON, URNER, STOCKBRIDGE and CONSTABLE, JJ.

*S. S. Field* (with whom was *Wm. F. Pirscher* on the brief), for the appellants.

*Edward M. Hammond,* for the appellee.

PATTISON, J., delivered the opinion of the Court.

The appellee, a merchant of Baltimore City, was in the year 1909 the owner of a farm near Ellicott City, in Howard County, and the appellants were dealers in livestock at the Union Stock Yards in said city.

The appellee in the fall of each year for a number of years prior to that time had bought from the appellants small young cattle, known as stock cattle, and had placed them upon his farm where they were fattened and improved and were thereafter, in the succeeding year, sold at the stock yards through the agency of the appellants.

According to the evidence offered on the part of the appellee, he, in the fall of 1909, called a number of times at the stock yards, but could not find there any cattle to suit him. It was then that the appellants suggested that he let them sell to him, to be shipped from Chicago, "heifers the same as he had been buying of them" at the Baltimore Stock Yards, in the previous years; the price therefor f. o. b. Chicago would be $2.75 or $2.80 per hundred weight, certainly not exceeding $2.85. The appellee testifies that as a result of this suggestion and offer an agreement was then and there entered into by and between them, by which the appellants sold to him, to be delivered in good condition on the cars at Chicago, at and for the sum of $2.75, and not to exceed $2.85 per hundred weight, one carload of sound, thrifty, young heifers, not to exceed forty in number, of the class and type he had previously been buying from them; and it was understood and agreed that the cattle so purchased should be dehorned and that there were to be no white ones or Jerseys among them.

This contract or agreement was made about November 29th, a few days before the appellee was to start for the South, and as he was not to return for several weeks, he left with one Rogers, with whom he was in some way associated in the mercantile business, his check signed by him and drawn to the order of the appellants, with the amount blank, but with direction to Rogers to fill in such blank with the amount given to him by the appellants when the exact weight and price of the cattle were ascertained and communicated by them to him. He then notified the appellants of this arrangement.

The cattle were shipped from Chicago on Thursday the 9th day of December, and arrived in Howard County on Sunday afternoon, the 12th day of December, three days thereafter, but instead of putting them off at Hollofields Station, they were carried to Ellicott City, because, as stated, there was no chute at Hollofield by which they could have been unloaded.

On the 13th day of December the appellants wrote to Rogers enclosing statement giving the weight as well as the price of the cattle. The price, as stated therein, was so much as $3.25 per hundred weight for seventeen of the cattle and $3.00 per hundred weight for the remaining twenty-three. In the letter to Rogers the appellants stated to him that upon the return of the statement with check for amount shown by the statement to be owing by appellee, they would receipt the statement and forward it to him. Rogers in response to this request filled in the check for the amount stated in the enclosure to him and, with the statement, sent it to the appellants, on the 14th day of December, and it was thereafter endorsed and used by the appellants; the statement which was receipted and returned to Rogers was given by him to the appellee upon his return from the South.

The appellee, before leaving for the South, directed Tucker, the manager of his farm, to get the cattle upon their arrival at the station and take them to the farm. They arrived at Ellicott City, as we have said, on Sunday afternoon between two and three o'clock, but it was not until nearly dark that Tucker got word from the station agent that the cattle were there. It was then too late to get them to the farm that evening, the farm being several miles away, and thus they were required to remain all night in the open pen at the station. On the following morning, however, Tucker started with them from the station, but owing to their condition "two of them fell on the road and had to be rested well before he could get them home." He describes their condition at that time as being a terrible looking lot of cattle, running at the nose, sore eyes, and seemed to have sore throats."

David Whalen, son of the appellee and at that time a medical student living in Baltimore, visited the farm at least once a week. He saw the cattle on December 14th and frequently thereafter, and when asked to describe their condition when he first saw them, the second day after their arrival, he said of them that they were poor, their coats were rough, they had pus formation in the eyes, or around the eyes, with a bluish scum like covering over the eyes, and running from the nostrils. He stated that the entire eyeball seemed to be affected and there was a constant leak of pus from the nose. This was true, he said, of at least three-fourths of them; and of the entire number nine of them died. He also said that many of them were practically blind. A description of their condition some days thereafter, given by another son of the appellee, is very similar to that given by David.

The appellee reached Baltimore on his return from the South on the 20th day of December, and on the succeeding day, December 21st, before he had an opportunity to see the cattle, he wrote the appellants as follows:

"I have just returned from the South and am informed by my son that the cattle have arrived. There has been a great mistake somewhere. I explicitly told you that I wished these similar to what I had formerly bought of you, and wanted them all dehorned. A part of these are dehorned, but there is no comparison between the quality of them and those you have formerly sold me; beside I am under the impression that there is a mistake in the weight. I consider this a lot of trash, basing my opinion upon what my son says. I have not seen them, and will kindly request that you take them off my hands. Three of them are dead, and there are about ten more that I think will die. It is certainly a diseased lot of cattle.

"I called you up over the telephone, but could not get in communication with you. Kindly let me hear from you promptly."

Either on the first or second day after writing the above letter the appellee went to the farm and after seeing the cattle and finding them in the condition described by his son David, called the appellants over the 'phone and again asked them to take the cattle back and refund to him the money he had paid to them under the facts and circumstances as above stated. But the appellants refused to do so, and it was then that the appellee brought his suit, which has resulted in the judgment from which this appeal is taken.

The facts as revealed by the appellants' evidence is altogether different from those given in evidence by the appellee. They deny that they sold said cattle to the appellee, but state that at his request and upon his direction they ordered the cattle to be shipped to him from Chicago, and that they were to receive only a commission, amounting, as the aforesaid statement discloses, to $14.36. That there was no warranty of soundness or as to any other quality or condition of the cattle.

The declaration contains the common counts and two special counts. In the first of these it is alleged that the amount paid by check filled in by Rogers, upon the statements sent him by appellants, was in excess of the amount that was to be paid, under the alleged contract between the parties, for the cattle purchased thereunder, and it was to recover such overcharges that this count was inserted in the declaration. The second special count is upon the contract for damages resulting from the breach of the alleged warranty. The correctness of the pleadings is not questioned. It is on the ruling of the Court upon its instruction to the jury and the admissions and exclusion of certain testimony that the case is before us.

The contentions of the appellants, as stated in the brief, are as follows:

"1. That by receiving the cattle and paying for them and waiting ten days before making any complaint during which time several of the cattle had died, the plaintiff had lost his right, if he had any, to re-

scind the contract for any alleged difference between the cattle contracted for and the cattle delivered, and therefore the Defendants' Sixth Prayer should have been granted.

"2. That there is no implied warranty upon the sale of live stock, and that there was no evidence legally sufficient to prove any express warranty in the transaction between the plaintiff and the defendants, and therefore the Defendants' Second and Third Prayers should have been granted.

"3. That the Court erred in certain rulings in admitting and rejecting evidence."

We will first consider the second of these contentions, not that there was no implied warranty, but whether there was evidence legally sufficient to go to the jury tending to prove an *express* warranty.

To decide this question we must determine the character of evidence to be offered tending to prove an express warranty.

Our predecessors said so early in the case *Osgood* v. *Lewis*, 2 H. & G. 518, that "to create an express warranty, the word 'warrant' need not be used; nor is any precise form of expression required. Any affirmation of the quality or condition of the thing sold (not uttered as a matter of opinion or belief), made by the seller at the time of the sale, for the purpose of assuring the buyer of the truth of the fact affirmed, and inducing him to make the purchase; if so received and relied on by the purchaser is an express warranty. And in case of oral contracts on the existence of these necessary ingredients to such a warranty, it is the province of the jury to decide, upon considering all the circumtances attending the transaction. It is in the *oral* contract set up by the appellee and the one upon which he seeks to recover damages resulting from the breach of the warranty that the appellee claims such warranty is found, and the question whether it is so found to exist in said oral contract was for the deter-

mination of the jury, if the evidence adduced at the trial tending to show such facts was legally sufficient to be submitted to the jury for its consideration, and, in our opinion, the evidence in relation thereto, which we will not repeat or discuss, was legally sufficient to go to the jury."

As to the first contention, this Court has repeatedly said, the last time in the case of *White Automobile Co.* v. *Dorsey,* 119 Md. 258, that "upon a breach of the warranty two remedies are opened to the buyer; first, he may return the chattel, if delivered, within a reasonable time after discovering the breach, and recover back in assumpsit on the common counts the amount paid; or, secondly, he may retain the chattel and sue upon the contract for damages resulting from the breach of the warranty." *Crenshaw* v. *Slye,* 52 Md. 146; *Franklin* v. *Long,* 7 G. & J. 419; *Horn* v. *Buck,* 48 Md. 358; *Tayman* v. *Mitchell,* 1 Md. Chy. 501, and other cases.

The appellee in this case upon his return from the South, nine' days after the arrival of the cattle in Howard County, and after learning from his son of the alleged condition of the cattle, at once wrote to the appellants asking them to "take the cattle off his hands;" to which letter he received no reply. On the first or second day after his return he visited the farm and saw the condition of the cattle and again communicated with the appellants, this time over the 'phone, complaining of their condition, and telling them that he would on the following Monday morning return the cattle to them, but they stated that they would not receive them. It was because of this refusal that he retained the cattle and instituted suit upon the contract for damages resulting from the breach of the alleged warranty, a remedy that was open to him under the settled law of this State, unless he had in some way waived the breach: and upon an examination of the facts disclosed by the record we fail to find any such waiver.

It is true that after their condition had been observed by the farm manager they were taken by him from the station at Ellicott City to the farm of the appellee, where they were cared for until the appellee returned. The manager was acting under limited directions from the appellee to get the cattle from the station and drive them to the farm. The appellee, of course, was not expecting the cattle to arrive in the condition above described and no authority was conferred upon the manager to do more than to take them from the station to the farm, and this he did. The fact that the manager took the cattle from the station after their delivery to the appellee in Chicago, and carried them to the farm of the appellee, were a much more satisfactory investigation could be made with a view of ascertaining whether there was an actual breach of the warranty, could not, we think, have the effect of a waiver of the breach. Nor should the fact that the appellants were not notified of the condition of the cattle by the manager or sons of the appellee be regarded as a waiver of the breach, when it is not even shown that they knew from whom the cattle had been purchased or that the appellants were interested in them; and the promptness with which the appellee acted in the matter upon his return home is altogether inconsistent with any waiver of the breach on his part at such time.

It was also argued by the appellants that there was no legally sufficient evidence as to a breach of the warranty, because of a want of evidence on the part of the appellee as to the condition of the cattle at the time of delivery in Chicago. In reply to this, we will state that the evidence of Dr. Mackie, the veterinary surgeon called to the stand as an expert by the appellee, was, we think, legally sufficient to go to the jury tending to show the unsound condition of the cattle at the time of such delivery. There was produced on the part of the appellants evidence as to their sound condition at such time, but the question of soundness *vel non* was one for the jury to determine upon the evidence before it.

The ruling upon the first exception to the evidence, which exception it seems is not pressed by the appellants, was, we think, correct. And we find no error in the rulings of the Court as to the second and third exceptions.

In the fourth exception to the testimony the Court was asked, at the conclusion of the plaintiff's testimony, to strike out, first, all the testimony of Frank Whalen tending to show a warranty of soundness of the cattle; and, secondly, all the testimony of the plaintiff in regard to the price and quality of the cattle, for the reason that such parol testimony was not permissible to vary the written memorandum of sale. The question here presented is fully answered by what we have said of the oral contract in this case, in connection with said alleged warranty.

As to the fifth exception, it would seem that the question was thereafter answered; if so, there is no cause for complaint on the part of the appellants. But if it were not so answered, the evidence does not disclose, we think, sufficient qualification to entitle the witness to speak as an expert. As a matter of fact, he may have possessed knowledge sufficient to enable him to have so testified, but this fact is not shown by the record.

Having fully discussed the law applicable to this case, and finding no departure therefrom by the Court below in its rulings upon the prayers, we deem it unnecessary to discuss them, and will therefore affirm the judgment of the lower Court.

*Judgment affirmed, the appellants to pay the costs.*