FAIRCHILD STRATOS CORPORATION,
Plaintiff,

v.

The SIEGLER CORPORATION,
Defendant.

Civ. A. No. 13485.

United States District Court
D. Maryland.

Nov. 18, 1963.

William L. Lynch, James W. Lamberton, and Cleary, Gottlieb, Steen & Hamilton, New York City, K. J. Mackley, and Bushong, Byron & Mackley, Hagerstown, Md., and Venable, Baetjer & Howard, Baltimore, Md., for plaintiff.

J. Cookman Boyd, Jr., and Sauerwein, Benson & Boyd, Baltimore, Md., and William R. Sweeney, and Sweeney, Irwin & Foye, Los Angeles, Cal., for defendant.

WINTER, District Judge.

Invoking diversity jurisdiction, Fairchild Stratos Corporation (hereafter called "Fairchild"), a Maryland corporation, having its principal office and place of business in Hagerstown, Maryland, has filed a proceeding for a declaratory judgment against The Siegler Corporation, a Delaware corporation, having its principal office in California, which acted in the transaction through its Hufford Corporation Division (hereafter called "Hufford"). Fairchild seeks a declaration that Hufford breached a contract between the parties, that the contract was rescinded by plaintiff, and that plaintiff is entitled to $500,946.00 damages, with interest. Hufford answered, and counterclaimed for a declaration that plaintiff breached the contract between the parties and is liable to the defendant for $88,631.81 damages, with interest, representing the unpaid balance of the purchase price for the machinery which was the subject of the contract and services to be supplied to make the machinery operational.

The contract was entered into on or about January 21, 1960, when Hufford, in response to an invitation from Fairchild, submitted to Fairchild a written quotation for the design and fabrication of a stretch-wrap forming machine, sometimes called a stretch press, and the quotation was accepted by Fairchild.

The stretch press is a sophisticated piece of machinery, the purpose of which was, with a high degree of automation,

to pull and stretch a sheet of aluminum to conform to dies for half sections of boat hulls so as to cause the formation of aluminum half-boat hulls which could be thereafter welded together to make a complete hull for certain aluminum pleasure boats that plaintiff desired to manufacture and sell. The original contract price for the stretch press was $287,532.-00, but by mutual agreement after the contract was entered into, the price was increased to $288,755.26. Fairchild also contracted to pay Hufford an amount not exceeding $23,000.00 for a qualified operating crew, to be provided at Fairchild's plant by Hufford, for a period of three months, to bring the stretch press to full scale production capability and to train Fairchild employees in operating procedures, maintenance and tooling. "Payment for the stretch press was to be made in six (6) installments, five (5) during the time that Hufford was shipping parts to Fairchild and installing them at the Fairchild plant, and the sixth upon the completion of shipment, installation and acceptance of the press by Fairchild." The contract set forth that components of the press would be shipped by Hufford beginning May 15, 1960 and shipments were to be completed by July 15, 1960. Final testing and training of personnel in operation, maintenance and tooling was to be completed three months later, i. e., October 15, 1960. Because of various difficulties encountered in shipping components, installation and operation, Fairchild extended the latter date to June 1, 1961. When it was not shown that the stretch press met the warranties of Hufford in the contract by that date, "Fairchild refused to accept further performance under the contract by notice given June 2, 1961, and formally rescinded the contract by letter dated June 23, 1961, in which it requested removal of the press and gave notice that it would seek recovery of all damages which it sustained."

The case presents two issues: (1) which of the parties, if either, is guilty of a breach of the contract; and (2) if a breach of contract is established, what is the liability of the party causing the breach for damages to the other. The first question is largely factual, and the second factual and legal.

## I. LIABILITY

### A—The Contract

Hufford's offer to Fairchild to build and install a stretch press was generated by an invitation, under date of December 23, 1959, from Fairchild to Hufford asking the latter to bid "on a 200 ton stretch forming press to be built according to certain conditions and specifications." Among other conditions, Hufford was asked to guarantee the function and time cycle for the complete formation of a 15 foot pleasure boat hull section comprising the outer skin full length and formed with complete detail from rail to keel as shown by dies constructed by Fairchild and observed by representatives of Hufford at a time when the dies were in use at a plant of The Martin Company, in Baltimore, Maryland. Hufford was also asked to guarantee the final delivery date, and it was cautioned that the machine must be so arranged as to eliminate the necessity of relying on operator's skill for continuous production, and that the auxiliary detail forming wiper [1] must function in a manner to eliminate any need for hand work in the formation of parts.

In response to the invitation, Hufford, under date of January 4, 1960, submitted its "Complete and detailed proposal for a special Hufford Stretch-Wrap Forming Machine for the forming of boat hull half sections." The proposal described various components of the machine, such as the foundation upon which the machine would rest, tension cylinder carriage assemblies, centroid shifter and die holding beams. The auxiliary detail forming wiper was generally described as adjustable power traversing heads mounting hard rubber rollers, or equivalent devices. It was stated that

---

1. This is a roller device to press the aluminum sheet being stretched against the die so as to obtain conformation of the sheet to the detail on the die.

the exact nature of the unit would be established by Hufford after acceptance of the proposal, for the reason that there were several "fundamental approaches to the problem of attaining proper part definition" and Hufford would select the method which would result in "best product quality commensurate with simplicity, speed and accuracy." Hufford affirmatively stated that "the equipment will be designed and built so that *no hand work* will be required in the formation of parts" (emphasis in the original).

Hufford's proposal also contained an agreement to supply vacuum loading equipment to be supported on a structure supplied by Fairchild. The place of mounting of controls was stated to be at the front of the machine. Certain of the push button controls were described, but the push button controls for the operation of the vacuum loading equipment and the auxiliary detail forming wipers were not described.

Hufford's proposal stated that the press would be capable of a full forming cycle every 2.5 minutes through maximum movement, excluding, however, loading or unloading. The full cycle would be controlled by three buttons. After this representation Hufford specifically guaranteed, "Hufford guarantees that the stretch forming equipment will be capable of producing formed boat hull halves at a rate of ten (10) parts per hour, or six (6) minutes per part on existing dies constructed by Fairchild, in conjunction with the Auxiliary Detail Forming Wiper." This guarantee was qualified in two respects, first, by the statement that it could not be expected that immediately after installation the machine would be capable of producing parts at the guaranteed rate, but, rather, that proficient operators must be trained, tooling probably modified, forming speeds established and machine functions refined by regulation, adjustments and possibly minor revisions and, second, that as a consequence "Hufford is to provide a qualified operating crew for a period of three (3) months to bring this facility to a full scale production capability,

simultaneously training your personnel in operational procedures, maintenance, tooling, etc." The cost of providing the crew was fixed at $23,000.00, and was to be borne by Fairchild.

Hufford agreed that if its proposal were accepted it would manufacture and ship components in the order required for installation, so that installation could proceed concurrently with the latter stages of machine manufacture. The time schedule set forth in the proposal was that shipment of equipment would start approximately four months from the date of receipt of the contract and be completed two months thereafter. The original proposal price was $287,-532.00 for the boat press and $23,000.00 for the operating crew. Hufford concluded by stating its readiness "to proceed immediately on receipt of your authorization."

By telephone communication on January 15, 1960, Fairchild advised Hufford that it was accepting its proposal and, under date of January 21, 1960, Fairchild issued a formal purchase order constituting formal acceptance of the Hufford proposal, both with respect to the construction of the press and the furnishing of the operating crew for a three month period.

The purchase order made four changes in the proposal submitted by Hufford. It limited Fairchild's responsibility for design of the foundation for the press to Fairchild's furnishing Hufford with data concerning the proposed location, soil bearing loads, and the like; while Hufford was to provide the design for the pit and foundation. The $23,000.00 cost for the operating crew was to be prorated, so that if less than a three month period were required, Fairchild's obligation would be accordingly reduced. Fairchild proposed that Hufford agree to a cancellation charge not exceeding $2,000.00 in the event that Fairchild cancelled the contract prior to February 8, 1960. As a last change, Fairchild proposed that Hufford begin shipment within four months from January 15, 1960 (the date of telephone notice of acceptance), with

shipment to be completed within two additional months.

Hufford agreed to these changes and proposed one additional, which was agreed to by Fairchild, namely, that an inadvertent reference to "unloading equipment" be stricken from the proposal. At this time the schedule for progress payments was established and incorporated as a change notice into the contract.

Under date of March 14, 1960, Hufford prepared, and transmitted to Fairchild, detailed specifications describing the equipment. These specifications described the wiper assembly, theretofore undescribed, as "An arch which spans the machine and moves on roller way bearings and hardened ways to cover the full length of 28 foot parts. On this arch will be mounted two five ton Wiper or hydraulic rams which will mount rubber rollers * * *."

### B—Performance of the Contract

By the terms of the contract, Hufford was obligated to begin shipment of the component parts of the stretch press on May 15, 1960 and to have the components of the press all delivered by July 15, 1960. Beginning May 15, 1960 Hufford was continually in default. It is unnecessary to recite the details of all of the various deliveries, changes and breakdowns except as they relate to certain defenses asserted by Hufford, discussed later in this opinion. A brief resume suffices.

Hufford did not make its first shipment, that of rails for the press, until July 12, 1960, and in the period from May 15 until that date Hufford acknowledged that it was behind in deliveries, promised that the overall schedule would be maintained, and acknowledged that Fairchild's seasonable entry into the boat market was being jeopardized. Final shipment of all of the components of the press was not received by Fairchild until September 8, 1960 and installation did not take place until much later. The press was not in condition to operate continuously until November 21, 1960. However, at Hufford's insistence, the operating crew which was to be provided for a three month period arrived and began work on the press on October 31, 1960. By November 2, 1960, Fairchild had made all of the progress payments due and owing to Hufford, except the final payment which was due only after the press was completely installed, had been brought up to its guaranteed production capacity and accepted by Fairchild. Late in September, 1960, Fairchild had received an opinion of its counsel that it would probably be liable for expenses incurred by those distributors with which it had contracted to sell boats, which were to have been produced by the stretch press.

After the press became operable in November, 1960 there was roller failure and it was necessary for Hufford to authorize Fairchild to obtain a new roller. The new roller was not received by Fairchild and installed until December 20, 1960. On December 22, 1960 a left and right boat hull were stretched and when they were trimmed and put on the assembly jig it was found that the half hulls matched but the tumble home area lacked any formation at all.[2]

Hufford undertook to redesign the wiping tool to be used in the tumble home area, but the new tool was not installed until January 9, 1961. On January 10, 1961 the boat die was set up and it was discovered that the new tool caused interference with the die and would have to be reworked. The reworked tumble home tool was received by Fairchild on January 21, 1961 but, again, it did not work properly and finally it was shipped air freight back to Hufford in California for additional work and adjustment.

Several meetings were then held within the period from January 6, 1961 to February 10, 1961, both in California and in Hagerstown, to discuss problems in connection with the stretch press and

2. The "tumble home area" is the stern of the boat where the sides bend inward to join. It may be likened to the base of an isoceles triangle.

to try to work out an agreement as to what would constitute an acceptable half boat hull. Hufford agreed that the half boat hulls stretched in December, 1960 could not be matched in position by hand pressure so that they could be welded together to form a completed hull by reason of lack of conformation in the tumble home area, and Hufford agreed to provide a new trial to form the tumble home. Hufford also agreed to correct various machine difficulties and electrical malfunctions. Fairchild requested a date upon which Hufford would have the stretch press qualified and ready for acceptance, and it was represented on behalf of Hufford that the machine would be ready for acceptance by April 7, 1961. Hufford was orally advised that Fairchild would set June 1, 1961 as a deadline for qualification.

The oral agreements between the parties as to the work remaining to be done and the problems requiring correction were confirmed in writing by a memorandum sent by Hufford to Fairchild. In the memorandum, purportedly a summarization of discussions held on February 9 and 10, 1961, Hufford agreed to redesign and modify the machine element to provide configuration in the tumble home area, stated that Fairchild was to supply the sheet aluminum for the acceptance test, and proposed a set of standards to be used in determining whether the half boat hulls were in reasonable conformity with the die and in reasonable conformity with each other. In the memorandum Hufford represented that the stretch press would be complete on or about April 7, 1961.

Fairchild replied to the memorandum, agreeing to supply thirty aluminum sheets, asserting that the material in the tumble home area should not stand more than one-fourth inch off the die, suggesting a standoff tolerance of three-eighths of an inch for another portion of the hull, and giving Hufford formal notice that Fairchild considered June 1, 1961 as the absolute deadline for the proving of the machine and the acceptance by Fairchild. Hufford replied, stating that it would require at least forty aluminum sheets and perhaps more, rejecting the precise dimensions of tolerance advanced by Fairchild, but reiterating its original suggestion that the tolerance would be no more than that which could be pushed into position against the die by hand pressure and repeating, but refusing to guarantee, its target date of April 7, 1961. On March 15, 1961 Fairchild conceded that as "a matter of necessity" it would bear the cost of whatever material might be required during the next series of experimentations, and on April 5, 1961 Hufford wrote Fairchild that the latter would be advised when the machine was considered fully able to run before any attempt was made to form parts. Hufford repeated its statement that it would not accept a dimensional limitation for tolerance in the tumble home area or in the body area, but would stand by its statement with respect to the tumble home area that the part would be sufficiently conformed to be laid back against the die by hand pressure.

The new tumble home assembly was received and installed at the Fairchild plant on April 4, 1961. The following day the die was mounted and Hufford's representative ran two parts on the machine. Although there was marked improvement in conformation on the second part, the stern area stood approximately two feet from the die and it was impossible to force it into position by hand. Nevertheless, Hufford's representative attempted to get written confirmation from Fairchild that the machine was functioning properly, but Fairchild refused, stating that such confirmation would be given as part of final acceptance, including the formation of hull sections.

*C—Hufford's Failure to Perform*

On April 12, 1961 two additional representatives of Hufford arrived at Fairchild. The corrective work on the machine was examined by them and, by April 15, 1961, they began the stretching of boat hulls with Fairchild personnel present as onlookers or helpers in loading and unloading the machine. On April 24,

1961 Hufford's representative stretched three sheets of aluminum. The first hull stretched was unsatisfactory; the second broke before the stretching was complete and it was trimmed and regripped and broke again; a third sheet was pulled and left on the die for inspection by Fairchild personnel.

On April 25, 1961 Hufford's representative advised Fairchild that he was ready for the qualification test. Fairchild's representative inquired about the compliance of the boat press with its specifications, and this prompted Hufford's representative to prepare a test procedure and deliver it to Fairchild. At this point there was a further discussion between Fairchild's representative in Hagerstown and Hufford's representative in California and it was agreed that the qualifying run would consist of six pieces of each half boat hull, rather than ten pieces as initially agreed by the parties. Hufford then advised its representative in Hagerstown that Hufford would undertake the qualifying test, subject to agreement between Fairchild and Hufford "as to the conditions of the test and the forming sequence to be followed." When this information was conveyed to Fairchild further communication between Fairchild, in Hagerstown, and Hufford, in California, ensued, in which Fairchild advised Hufford that there was no agreement as to the conditions of the test and the forming sequence but, rather, that Fairchild assumed Hufford would conduct the test using the greatest degree of automation possible, producing and reproducing boat hulls of the finest quality obtainable from the existing dies. Hufford responded by stating that it would proceed with the test, and that it would follow the forming sequence and procedures set forth in a memorandum which had been delivered to Fairchild on April 25, 1961.

Fairchild stated that it would be willing to express its reaction to the memorandum but that Hufford was free to undertake the qualifying test at any time, and Fairchild's willingness to comment must not be construed as interfering with or directing Hufford's activities. Hufford stated that it would submit a detailed outline of the manner in which it proposed to conduct the test. Its Hagerstown representative returned to California for that purpose.

On April 28, 1961 Hufford sent Fairchild the detailed outline, entitled "Forming Sequence—Fairchild Boat Press."

Fairchild reviewed the memorandum and its history of prior transactions with respect to the boat press and, on May 8, 1961, Fairchild wired Hufford that it would accept or reject the machine only on a basis of its operating characteristics, and that there was no substitute for an actual demonstration. Fairchild did advance some comments on the memorandum and disclosed " * * * we have formed some reservations regarding the degree of automation to be demonstrated and the amount of operator judgment required to initiate and manually maintain the sequence of machine operations involved." Fairchild's communication precipitated a meeting in Hagerstown on May 18, 1961.

At the meeting Hufford stated its position that it would not proceed with the test unless Fairchild accepted, in advance, Hufford's proposed test procedure. Additionally, Hufford made clear that if Fairchild accepted the forming sequence, and if the boat press performed as outlined in that sequence, Fairchild would be obliged to accept the boat press without regard to whether or not it could produce acceptable half boat hulls. Fairchild refused to enter into such an agreement and reiterated its desire that the test be conducted.

On May 23, 1963 Hufford sent a teletype to Fairchild stating " * * * We maintain our position that machine and procedure for final acceptance test must be accepted and approved by Fairchild before we run rinal [sic] acceptance parts." Fairchild replied, "If Hufford's position is final concerning refusal to proceed with qualification testing * * * we have no alternative but to consider Hufford in default."

Hufford replied May 24, 1961 stating that it was desirous of completing the qualification test and that "a normal part of any such test is an agreement on the procedure that will be employed during such testing." The reply then detailed that Fairchild had refused to approve any testing procedure, had stated, but did not define, its reservations as to the degree of automation to be employed, Fairchild offered no substitute testing procedure and concluded by asserting that Fairchild was delaying by its action the conducting of the tests. To this, Fairchild, under date of May 26, sent a teletype to Hufford stating that "Fairchild awaits proof of press by actual operation by Hufford. June 1st nearly here. If Hufford fails to heed our warning regarding this firm deadline litigation will undoubtedly follow shortly." Thereupon, Hufford stated that it would "start acceptance test on June 5," but Fairchild advised Hufford that the latter's offer to go forward came too late. Fairchild then made a settlement offer to Hufford, which was rejected, and litigation followed.

### D—Hufford's Factual Defenses

Hufford invokes, as factual reasons for its failure to conduct the qualification tests within the time period fixed by Fairchild, and thus to demonstrate that the machine possessed the production capabilities which it warranted, certain matters which require some discussion.

■ Hufford asserts, first, that it was under no obligation to conduct the qualification tests absent an agreement on the part of Fairchild as to the manner in which they would be conducted. In support of this position, Hufford adduced testimony at the trial to establish the existence of a custom and practice in the industry in regard to the production and sale of complicated machinery.

That testimony showed that it is quite customary to agree upon a test procedure as part of the contract documents, or to provide in the contract documents that a test procedure would be agreed upon prior to actual testing, but the testimony fell far short of establishing that when the agreement between the parties is silent that there is any obligation on the part of the buyer to agree to a test procedure when the seller, as an afterthought, requests such agreement. On this point it is certain that the contract documents between the parties, other than setting forth some general standards by which the quality of production could be measured, lacked specificity and there was totally lacking any agreement that Fairchild would be called upon and would agree to a test procedure in advance of actual testing. Moreover, the evidence is clear that the original contract by its terms was to have been fully performed by October 15, 1960, the date when the press was to have reached guaranteed performance. It was not until April 25, 1961, *upon inquiry from Fairchild*, that any mention of an agreed test procedure in advance of actual qualification was made. Manifestly, Hufford had no legal right to refuse to perform in accordance with its obligations for this reason.

■ Hufford also asserts that various delays in performance were occasioned by Fairchild. The delays are said to have been four-fold: (a) the delay caused by Fairchild's insistence upon having three 10-ton wipers; (b) the delay caused because Fairchild requested a reduced voltage starter; (c) the delay caused by Fairchild's failure to provide adequate filtering equipment for the servo valves; and (d) Fairchild's insistence that there be adequate forming in the tumble home area. Analysis of the testimony demonstrates that each of these alleged delays is lacking in substance.

With regard to the number of wipers and the pressure that they would exert, the original contract documents were silent. After Fairchild received detailed specifications from Hufford showing two wipers each exerting five tons of pressure, Fairchild raised the question as to whether there should be three wipers, each exerting ten tons of pressure. Evidence was presented which showed that there had been discussions in this regard during the pre-contract period, but, in

any event, it is clear that shortly after April 6, 1960 Hufford acknowledged that three wipers would be required, and when Hufford conducted tests to indicate that five tons of pressure was sufficient Fairchild acquiesced in the results of Hufford's tests. Acquiescence came shortly after May 16, 1960, so that it may be fairly said that even if Fairchild thus caused some delay in final performance of the contract the delay was considerably less than the extension of the date for performance granted by Fairchild.

The matter of a reduced voltage starter was raised when Hufford, after considerable delay, furnished Fairchild with electrical schematic drawings for the stretch press, and Fairchild, after examining the drawings, requested the substitution of a reduced voltage starter to accommodate the machine to the type of electrical service at the Fairchild plant. Hufford claims that the effect of this change was to cause delay of two months and nine days in its completion of the contract. When the effect of Hufford's delay in furnishing the drawings, and Hufford's failure to estimate with reasonable accuracy the manufacturing time for the original starter which it proposed to use, is considered, the net delay caused by the substitution was only one week. Clearly, Fairchild's agreement to extend completion date of the contract from October 15, 1960 to June 1, 1961 was more than adequate to accommodate any delay caused by the change.

The same may be said with respect to the claim of delay because of any failure on the part of Fairchild to provide adequate filtering equipment for the servo valves. With regard to them, the delay, at most, was only fifteen days and, hence, Fairchild's extension of ultimate completion date to June 1, 1961 gave Hufford ample time to perform the contract and non-performance cannot be said to be attributable to any delays on the part of Fairchild with regard to the wipers, the reduced voltage starter or the servo valves.

Hufford's claim that it was under no obligation to provide a press to bring about forming in the tumble home area of the half boat hulls is obviously a defense engendered by hindsight. At the time that the contract was formulated, the intention of the parties was clear that there be forming in the tumble home area. The dies shown Hufford and the drawings furnished Hufford clearly indicated the necessity of such forming. If there should be any doubt as to the original intention of the parties, it is clear that in the performance of the contract Hufford understood that forming in the tumble home area was a necessity and an obligation which it had accepted, because when difficulties in this regard were encountered Hufford exerted every effort to correct them without the slightest suggestion on its part that it had no obligation to do so.

Hufford's third defense relates to the length and condition of the aluminum sheets from which half boat hulls were to be stretched and formed. The sheets were furnished by Fairchild and Hufford presented evidence, and now claims, that the shortness and waviness of the sheets either caused or contributed to the failure of the stretch press to make half hulls capable of being welded into a complete boat hull with a minimum of hand labor. Again, the record shows that this defense is an afterthought. During the period of installation and testing of the machine, Hufford's representative present at the Fairchild plant, in his periodic reports to his employer, never referred to or took exception to the length or condition of the aluminum sheets. When correspondence and negotiations ensued between the parties as to the number of additional sheets to be furnished by Fairchild for final testing and who would bear the cost thereof, no question of the length or condition of the sheets was raised. Fairchild was never asked to buy longer sheets, nor was any protest ever lodged with Fairchild about the condition of the sheets. Under these circumstances, Hufford cannot now claim any

breach of the contract on the part of Fairchild in this regard.

■ As a fourth defense, aside from some miscellaneous other suggestions too frivolous to mention, Hufford claims that there was a deliberate and conscious attempt on the part of Fairchild to prevent Hufford from performing the contract so as to provide Fairchild with a means of avoiding it and a vehicle to recapture expenditures made by Fairchild with regard to it. Hufford predicates this defense on evidence that in July, 1960 Fairchild was under pressure from its bankers to eliminate money losing projects. In September, 1960 Fairchild did notify various distributors with whom, commencing in February, 1960, it had entered into distributors' agreements for the marketing of boats that they should not make additional commitments or expenditures until they received further word from Fairchild. It also sought the opinion of its counsel with regard to its potential liability to distributors, and was advised that such liability might well exist if the boat program were abandoned. Fairchild attempted to sell its "boat program" by selling the press and assigning its distributorship contracts to the purchaser, but when its efforts were unsuccessful it notified its distributors, on November 28, 1960, that it would probably not renew their distributorship contracts and invited them to terminate the contracts immediately. It was not until after June 1, 1961 that Fairchild notified Hufford that Fairchild considered Hufford in default, and Fairchild was terminating the contract.

This evidence fails to support the contention which Hufford seeks to erect upon it. Fairchild's activities can only be characterized as those of prudence and caution, because it was obvious to Fairchild throughout the period that it was communicating with its distributors and seeking to sell the stretch press that Hufford was badly in default under the contract. That Fairchild sought to minimize its damages does not mean that it caused a breach of the contract. At most, Fair-

child had a motive in failing to waive all of Hufford's defaults under the contract, but if, as is hereafter concluded, Hufford breached the contract, Fairchild's motive in asserting the breach is immaterial.

*E—Summary and Conclusions—Breach of Contract*

From the facts specially found, as set forth above, I find the ultimate facts, and reach the ultimate conclusions, as follows:

1. Hufford agreed to build and install a stretch press and to complete shipment thereof by July 15, 1960 and especially warranted the press to be capable of producing within three months from that date " * * * boat hull halves at a rate of ten (10) parts per hour or six (6) minutes per part on existing dies constructed by Fairchild," and that the stretch press would be " * * * designed and built so that *no hand work* will be required in the formation of the parts."

■ 2. Hufford failed to perform the contract or to fulfill its special warranty by June 1, 1961, notwithstanding that Fairchild waived performance by Hufford prior to that date, and had agreed to a less rigorous test to determine the acceptability of the stretch press.

3. Fairchild's refusal to extend Hufford's date of performance beyond June 1, 1961 was fair and reasonable under all of the circumstances.

4. Whether the boat press is capable of performance in accordance with the special warranty is unknown, but, in view of the repeated failure of the stretch press to perform, the conclusion is inescapable that it is extremely unlikely that the boat press possesses this capability, absent an actual demonstration that it possesses this capability.

■ 5. Hufford had an obligation to demonstrate the production capability of the stretch press on or before June 1, 1961, and its refusal to meet that obligation was arbitrary, unreasonable and without legal justification, so that Huf-

ford's refusal constituted a material legal breach of the contract.

6. Fairchild had a legal right to refuse to accept the stretch press and to rescind the contract. "Fairchild refused further performance of the contract on and after June 2, 1961 and formally rescinded it by notice dated June 23, 1961," because of Hufford's breach of warranty and Hufford's unjustified refusal to perform.

7. Fairchild is entitled to judgment on Hufford's counterclaim and to damages and supplementary declaratory relief, as hereafter discussed.

## II. DAMAGES

Fairchild offered evidence to establish, and contended in its first post-trial brief, that it is entitled to damages in the amount of $462,284.28, with interest. This figure is the sum of the following items:

$216,872.26 progress payments paid by Fairchild under the contract.

39,888.08 cost to Fairchild of construction of the stretch press foundation, including appurtenant electrical and mechanical facilities.

3,434.30 cost of aluminum sheets furnished by Fairchild to Hufford in the latter's attempt to qualify the machine.

1,944.46 cost to Fairchild of miscellaneous items purchased by Fairchild at Hufford's request to make the press operable.

18,135.60 cost to Fairchild of compensation of its hourly and salaried employees who assisted Hufford in the installation and testing of the machine.

2,975.00 cost of restoration of Fairchild's plant to the same condition as prior to delivery of the machine.

5,643.57 Maryland use tax paid by Fairchild on the purchase of the machine.

8,541.83 Fairchild's cost of equipment, less depreciation and salvage, intended to be used with the boat press.

2,513.82 travel and related expenses incurred by Fairchild in connection with the exhibition of prototype boats.

10,824.80 transportation costs of component parts of the storage press paid by Fairchild, as per the contract.

48,000.00 payments to Miracle Marine, Inc., a distributor, as expenses under a distributor's contract.

28,000.00 claim asserted by Miracle Marine, Inc., as damages under a distributor's contract.

8,915.96 settlement amount paid by Fairchild to Kioti Marine, Inc., a distributor, for termination of distributor's contract.

6,594.60 settlement amount paid by Fairchild to Frank A. Baldus & Associates, a distributor, for termination of distributor's contract.

60,000.00 Fairchild's estimate of potential liability to six other distributors.

It is conceded by the parties that the plaintiff's right to damages is governed by the Maryland Sales Act, Annotated Code of Maryland (1957 Ed. and 1963

Supp.), Art. 83, § 19 *et seq.* The following provisions of § 87 seem applicable:

"§ 87. *Rights in case of breach of warranty.*

(1) Where there is a breach of warranty by the seller, the buyer may, at his election—

\* \* \* \* \* \*

(c) Refuse to accept the goods, if the property therein has not passed, and maintain an action against the seller for damages for the breach of warranty;

(d) Rescind the contract to sell or the sale and refuse to receive the goods; or, if the goods have already been received, return them or offer to return them to the seller and recover the price, or any part thereof, which has been paid.

(2) When the buyer has claimed and been granted a remedy in any one of these ways, no other remedy can thereafter be granted.

\* \* \* \* \* \*

(6) The measure of damages for breach of warranty is the loss directly and naturally resulting, in the ordinary course of events, from the breach of warranty."

Section 88 is also important, and it states:

"Nothing in this subtitle shall affect the right of the buyer or the seller to recover interest or special damages in any case where by law interest or special damages may be recoverable, or to recover money paid where the consideration for the payment of it has failed."

Whether § 87(1) (c) or § 87(1) (d) applies, the parties seem to be agreed that Fairchild may recover the progress payments it made under the contract, amounting to $216,872.26. They do dispute what, if any, additional recovery is permissible. Hufford asserts that Fairchild's right to rescission stems solely from § 87(1) (d), that that section authorizes recovery of the purchase price, but that § 87(2) prohibits Fairchild from enjoying the fruits of any other remedy. Fairchild argues that its right to rescind is granted by § 87(1) (c) and that its measure of damages, as stated by § 87(6) is the loss directly and naturally resulting, in the ordinary course of events, from the breach of the warranty. Alternatively, Fairchild argues that, even if its right of rescission arises under § 87(1)(d), § 88 preserves its remedy to special damages over and above recovery of the purchase price.

■■ The contract by its terms stated that the purchase by Fairchild of the stretch press was f. o. b. California. Ordinarily, this would be construed to mean that title passed to Fairchild in California, International Co. v. Sun-Maid Raisin Growers, 146 Md. 608, 614, 127 A. 393 (1925), and, hence, its remedy for breach of warranty would be solely that provided by § 87(1) (d). But the contract clearly and unmistakably by its terms provided that the purchase was not complete until Fairchild accepted the merchandise, and Fairchild's acceptance of the merchandise was not scheduled to occur until the components of the stretch press were shipped and installed and the production capabilities of the stretch press were established. It would seem, therefore, that Fairchild's remedy for breach of contract arose under § 87(1) (c) since "property" in the stretch press had not passed from Hufford to Fairchild, Annotated Code of Maryland, *supra,* Art. 83, §§ 36 and 37. Even if Fairchild's sole remedy is that granted by § 87(1) (d) the Maryland Court of Appeals has held, in Russo v. Hochschild Kohn & Co., 184 Md. 462, 41 A.2d 600, 157 A.L.R. 1070 (1945), that the rescission of a contract and recovery of the purchase price paid would not bar the recovery of special damages arising out of the breach of warranty in connection with the sales contract, because § 88 cumulatively preserves the right to recover special damages as well as interest.

As to damages, the case thus resolves itself to the amount of damages. The test to be applied is that stemming from the leading case of Hadley v. Baxendale,

9 Ex. 341 (1854), approved by the Maryland Court of Appeals in Winslow Elevator Co. v. Hoffman, 107 Md. 621, 635, 69 A. 394, 17 L.R.A.,N.S., 1130 (1908), namely, that recovery should be allowed for damages which are the natural and direct result of the breach of the contract, where such damages may reasonably have been within the contemplation of the parties at the time the contract was made as probable result of the breach. Application of this rule is subject to the basic proposition that plaintiff must prove by a preponderance of the evidence the damages actually experienced as a natural and direct result of the breach.

In addition to recovery of progress payments already made, Fairchild should recover $39,888.08 for the cost to it of construction of the stretch press foundation, including appurtenant electrical and mechanical facilities, and $3,434.30 for the cost of aluminum sheets which it furnished to Hufford. Fairchild claimed, in its post-trial brief, $18,135.60 for the cost to Fairchild of compensation to its hourly and salaried employees who assisted Hufford in the installation and testing of the machine.[3] In its post-trial reply brief, Fairchild concedes that the portion of this sum attributable to salaried employees was overstated by $3,333.00, so that it should recover $14,802.60. As to each of these three items, evidence shows that at the time it entered into the contract, Hufford, while not cognizant of the exact amounts, was fully aware that these costs and expenses would be incurred by Fairchild in connection with the installation and testing of the machine. Hence, it may be fairly said that the damages were completely foreseeable. The same may be said with respect to the item of $1,944.46, representing the cost to Fairchild of miscellaneous items purchased by Fairchild at Hufford's request to make the press operable, because the evidence shows that Hufford knew that these items were necessary and that Hufford requested Fairchild to supply them.

Fairchild should also recover $2,975.00 for the cost of restoration of its plant to its condition immediately prior to delivery of the machine. The evidence shows that to install the machine it was necessary that a pit be dug and a foundation laid. The evidence fails to show that these modifications have any useful purpose to Fairchild, aside from accommodating the plant to the installation of the stretch press. That modification of the plant was required is plain from the contract and, hence, clearly within Hufford's contemplation. Allowance of this item is supported by Burks v. Sinclair Refining Co., 183 F.2d 239 (3 Cir. 1950); Acme Brick Co. v. Hamilton, 218 Ark. 742, 238 S.W.2d 658 (1951); Trudgeon v. Patterson, 149 Okl. 68, 299 P. 419 (1931); Gascoigne v. Cary Brick Co., 217 Mass. 302, 104 N.E. 734, 735 (1914). Fairchild has made no separate claim for the cost of removing the stretch press, but it has requested that removal by Hufford be decreed. This relief, also, will be granted.

Hufford is chargeable with knowledge that Fairchild was obliged to pay Maryland use tax on the purchase of the machine. Fairchild has filed an application with the Comptroller of the Treasury for a refund of this tax, since Fairchild has rescinded the sale. Fairchild will be allowed recovery of $5,-

---

3. In its brief, Hufford has raised again objections to the manner of proving these damages which were overruled at the trial. Fairchild proved these damages by summaries and tendered all original records upon which the summaries were based for inspection. There could be no question but that the original records were admissible. Summaries and tabulations were likewise admissible, O'Donnell v. State, 188 Md. 693, 697, 53 A.2d 688, 54 A.2d 315 (1947); Laporte Corp. v. Cement Corp., 164 Md. 642, 165 A. 195, 168 A. 844, 108 A.L.R. 1474 (1933); U. S. v. Mortimer, 118 F.2d 266 (2 Cir. 1941); Lemon v. U. S., 164 F. 953 (8 Cir. 1908); 5 Wigmore, Evidence (1962 Supp.) § 1530. See also, Massachusetts Bonding & Ins. Co. v. Norwich Pharmacal Co., 18 F.2d 934 (2 Cir. 1927); Summons v. State, 156 Md. 382, 144 A. 497 (1929); 4 Wigmore, Evidence (3rd Ed.) § 1230.

643.57, Maryland sales and use taxes which it paid, Park Circle Motor Co. v. Willis, 201 Md. 104, 92 A.2d 757 (1952), clarified at 201 Md. 109, 94 A.2d 443 (1953), but Fairchild will be required to assign its claim for refund to Hufford when the judgment is paid.

From the evidence, I also conclude that Fairchild should recover $8,541.83, its net loss for equipment intended to be used with the boat press, and $10,824.80, transportation cost of the component parts of the stretch press. The latter was a cost imposed on Fairchild by the contract and the former for equipment necessary to operation of the stretch press. As such, Hufford was chargeable with knowledge that these were costs which would be incurred by Fairchild and that these would be damages sustained by Fairchild in the event of Hufford's breach of the contract.

The evidence also shows that at least through the knowledge of an ubiquitous Mr. Crump who seemed to have been the person partly responsible for persuading Fairchild to attempt the manufacture and sale of aluminum boats and for bringing Fairchild and Hufford into negotiation with one another, as well as one of the principals of Miracle Marine, Inc., Hufford knew that Fairchild was embarking on a business venture about which it had no previous knowledge or experience and for which it had no sales distribution facilities. As a consequence, Hufford knew, or should have known, that Fairchild would incur promotional costs and enter into sales arrangements with other persons contemporaneously with the installation and testing of the stretch press, to the end that Fairchild would be able to distribute its product when actual manufacture began. Viewed in this light, Fairchild should recover the items of $2,513.82 for expenses in connection with the exhibition of prototype boats and its $48,000.00 costs paid to Miracle Marine, Inc. and $8,915.96 and $6,594.60 damages for Fairchild's settlements with Kioti Marine, Inc. and Frank A. Baldus & Associates. Fairchild was successful in set-

tling with these two distributors on a basis of approximately 50% of their claims. I conclude that Fairchild should recover 50% of the claim of Miracle Marine, Inc., for damages, i. e., Fairchild should recover $14,000.00.

I conclude, however, that Fairchild should not recover $60,000.00 for its potential liability to other distributors. While I do not question the reasonableness of the estimated amount, and while the statute of limitations can not yet be invoked by Fairchild in the event claims are made upon it, no claims have been made, and the proof does not show a degree of certainty, or probability, that Fairchild will ever be called upon for any part of the estimated aggregate figure such that Fairchild is entitled to recovery. In short, Fairchild's potential liability for any part of this item of damages is too speculative to warrant recovery.

Although not asserted in its counterclaim, Hufford suggests in its brief that its liability for damages should be reduced by the reasonable rental value of the use of the stretch press by Fairchild for stretching radar antennae. Permission to use the stretch press for this purpose was granted Fairchild by Hufford, without any agreement in regard to compensation. The stretch press was used for stretching antennae while it was inoperable for stretching boat hulls, because certain parts necessary to the latter operation were being repaired. Absent an agreement for such rental, Maryland law neither implies an obligation for such rental nor does it permit a setoff on such a theory, Park Circle Motor Co. v. Willis, 201 Md. 104, 92 A.2d 757, 94 A.2d 443 (1952).

Fairchild is clearly entitled to interest on progress payments paid by it from the date of rescission, Park Circle Motor Co. v. Willis, *supra.* Under all of the circumstances of the case, I conclude that it is also entitled to legal interest on its other damages from the date of rescission, except future costs, i. e., restoration cost of plant and claim of Miracle Marine, Inc. for damages,

Bucher v. Federal B. B. Club, 130 Md. 635, 643–644, 101 A. 534 (1917); Robert C. Herd & Company v. Krawill Machinery Corp., 256 F.2d 946, 952 (4 Cir. 1958). While Fairchild would otherwise be entitled to interest on the settlements to Kioti Marine, Inc. and Frank A. Baldus & Associates, the dates of payment were not proved and, therefore, no interest will be allowed.

As to damages, I conclude that Fairchild is entitled to recover $384,951.28, with interest on $352,465.72, from June 2, 1961 to the date of entry of judgment, and is entitled to a decree directing Hufford to effect the removal of the stretch press, on condition that when the judgment is paid Fairchild will assign its claim to a refund of Maryland use taxes to Hufford.

Counsel may agree upon a form of declaratory judgment with supplementary relief as indicated herein and present it for signature.