## FRED J. MILLER, INC. *v.* RAYMOND METAL PRODUCTS COMPANY

[No. 341, September Term, 1971.]

*Decided May 16, 1972.*

524

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, SINGLEY, SMITH and DIGGES, JJ.

*Edward A. DeWaters, Jr.* for appellant.

*Johnson Bowie* for appellee.

SINGLEY, J., delivered the opinion of the Court.

This contest commenced when Raymond Metal Products Company (Raymond), a fabricator of metal pipe, brought suit against Fred J. Miller, Inc. (Miller), a dredging contractor, in the Circuit Court for Baltimore County to enforce payment of the price at which some 1,660 feet of dredging pipe had been sold by Raymond to Miller. Miller filed a general issue plea and a counter-

claim for $14,000.00, alleging breach of warranty. From a judgment for $3,369.60, together with interest and costs against Miller and a judgment in Raymond's favor on the counterclaim, Miller has appealed.

Fred J. Miller, the president of Miller, testified that in January, 1969, he visited Raymond's plant; explained the nature of his business and his need for dredge pipe, and was shown a lightweight pipe which Raymond's plant superintendent said would "stand approximately eighty pounds pressure" and "had expandable ends that would seal upon the spill going through." Miller placed an order for 2,000 feet of pipe.

Mr. Miller said that he picked up the pipe early in March, and hauled it to the air station at the United States Naval Academy, where his company had a dredging contract. He said that because the expanded, or "bell" end of each length of pipe was not expanded enough, there was difficulty in joining the pipe together, and it took three to five days to lay a string of pipe which would normally have been laid in 10 hours. Mr. Miller testified that once the pipe was assembled, the joints did not seal when the spill was pumped through under pressure, and there was leakage which caused damage to the Academy lawn.

On 17 March 1969, Miller wrote to Fay Pipe & Pile, Inc., a subsidiary of Raymond:

> "I started to use your pipe as of March 6, 1969 and find it is well suited for our work. However, it took us five days to assemble the pipe which is normally a ten to twelve hour job. The reason for this is the expanded end is not expanded enough and therefore we had to use two come-a-longs to draw the pipe together to make a tight fit. I will have to return thirty to forty pieces and have them expanded again on the one end. I expect to complete this project in Annapolis within two weeks, therefore, I would like you to make arrangements

with Mr. Long in Baltimore to have these pipes expanded in about three weeks."

On 19 March, Mr. Marsh of Fay Pipe & Pile, Inc. replied:

"This will acknowledge yours of March 17, 1969.

"I have discussed this situation with Mr. Long at our Baltimore plant. He will make arrangements to re-expand the bells to suitable diameter when you return them, which, from your letter, we expect to be about April 7th.

"It would be helpful if you would telephone Mr. Long at area code 301-477-5070 a few days before you are ready to return the pipe for re-expansion."

Mr. Long, who was Raymond's comptroller, testified that Miller never got in touch with Raymond, but conceded that some lengths of pipe had been left at Raymond's yard. Miller was billed for the pipe on 19 March and 14 April and a letter threatening suit was sent by Raymond on 8 May. On 9 May, Mr. Miller replied, "I will be in to see you one day during the week of May 12th to discuss the pipe and payment of the pipe," but never appeared. It was not until 30 November that Miller was credited with $663.00 for the 17 lengths of pipe which had been returned, but there was deducted from the credit what Raymond characterized as a "20% Restocking and Handling charge" amounting to $132.60.

On the record before us, it is impossible to conclude that Raymond, having been notified of the alleged defect within several weeks after Miller commenced to use the pipe, exhibited any real concern about the problem or exercised proper diligence in attempting to rectify the trouble. On the other hand, Miller was equally lax, since it made no effort to pursue the proposed re-expansion of the pipe. For some unexplained reason, Raymond treated what at first was an opportunity to cure the de-

fect as a rejection of the 17 lengths of pipe returned by Miller.[1]

In May or June, Miller moved the remainder of the pipe to another job, assembling it this time with wedges, in the hope of eliminating the leakage, but the pipe still leaked. In October or November, the pipe was moved to still another job site. When it was assembled there, the joints were packed with burlap, but the leakage continued. At this point, Miller gave up and sold the Raymond pipe as junk for $50.00, replacing it with steel pipe which was delivered to it in January, 1970.

This case is clearly controlled by the Uniform Commercial Code (the UCC), Maryland Code (1957, 1964 Repl. Vol.) Art. 95B. It cannot be argued that the goods were not warranted. There was an express warranty that the pumping of spill through the pipes would seal the joints, § 2-313; a warranty of fitness for the ordinary purposes for which such pipe is used was implied by § 2-314 (2) (c), *Myers v. Montgomery Ward & Co.*, 253 Md. 282, 252 A. 2d 855 (1969), and a warranty of fitness for the particular purpose which Mr. Miller had disclosed was implied by § 2-315. Similar warranties would have been implied on the facts of this case under the Uniform Sales Act: *Vaccarino v. Cozzubo*, 181 Md. 614, 31 A. 2d 316 (1943) ; *Powder Co. v. Campbell*, 156 Md. 346, 144 A. 510 (1929), and an express warranty would have been found even before the adoption of the Sales Act, *Osgood v. Lewis*, 2 H. & G. 495, 518 (1829).

Acceptance of goods may result under § 2-606 (1) when a buyer, after reasonable opportunity to inspect, notifies the seller that the goods are conforming or that he will retain them despite their non-conformity, *Webb v. Chevy Chase Cars, Inc.*, 259 Md. 284, 287, 269 A. 2d 810 (1970), or fails effectively to reject the goods, or does any act inconsistent with the seller's ownership. It is unnecessary to determine whether Miller's letter of

---

1. Since Raymond seems to concede that this was a rejection of commercial units permitted by Code (1957, 1964 Repl. Vol.) Art. 95B, § 2-601 (c), the question is not before us.

17 March amounted to an acceptance or rejection of the non-conforming pipe because its continued use of 83 lengths of the pipe after the defect had become apparent at the Naval Academy was clearly an acceptance, § 2-602 (2) (a) ; § 2-606 (1) (c).

Whether Miller did or did not accept the goods is relevant only to its liability for the payment of the purchase price, § 2-607 (1), but is of no consequence as regards its right to maintain an action against Raymond, since Miller could accept the pipe and seek damages for breach of warranty, provided that Raymond was given reasonable notice of the defect, § 2-607 (3) (a). 2 Anderson, *Uniform Commercial Code* § 2-607:5, at 207 ; § 2-607:8, at 208 (1971) ; 1 Hawkland, *A Transactional Guide to the Uniform Commercial Code* § 1.4801, at 260 (1964). This was also the rule under the Sales Act, *Fairchild Stratos Corp. v. Siegler Corp.*, 225 F. Supp. 135 (D. Md. 1963) ; *Distillers Distributing Corp. v. Sherwood Distilling Co.*, 180 F. 2d 800 (4th Cir. 1950) ; *Rittenhouse, W. Auto. Co. v. Kissner*, 129 Md. 102, 98 A. 361 (1916) ; *Greer v. Whalen*, 125 Md. 273, 93 A. 521 (1915). We think that the 17 March letter met the test of reasonable notice.

Under the uncontroverted evidence, Miller was entitled to judgment as a matter of law on its counterclaim, and could have recovered such damages as it could prove, since the testimony was that the pipe was defective, § 2-714 (2), and that consequential and possibly incidental damages were proximately caused by the breach of warranty, § 2-715 (1) and (2) ; *W & W Livestock Enterprises, Inc. v. Dennler*, 179 N.W.2d 484 (Iowa 1970) ; 2 Anderson, *supra* § 2-715:15-16, at 472-473; 1 Hawkland, *supra* § 1.510101-.510102, at 266-268.

Recovery could not be had, however, for the entire amount claimed, which included damages sustained on two later jobs, but would be limited to:

> (i) the difference between the value of the pipe accepted and the value which the

pipe would have had if it had conformed to the warranty, § 2-714 (2) ;

(ii) the reversal of the adjustment for the 20% "handling charge" and any other incidental damage which could be proved, § 2-715 (1) ; and,

(iii) the consequential damage sustained during the Naval Academy job, § 2-715 (2).

1 Anderson, *supra* § 2-714:19, at 453. There can be no recovery for consequential or incidental damages sustained thereafter, because Miller's use of the pipe on two subsequent occasions, when it knew it to be defective, must be viewed as an intervening cause so that it could no longer rely on the warranty, and any resulting damage was proximately caused by its own act, *Erdman v. Johnson Bros. Radio & Television Co.,* 260 Md. 190, 271 A. 2d 744 (1970) ; 1 Hawkland, *supra* § 1.510102, at 268. The purchase of the steel pipe nearly a year later cannot constitute "cover" as contemplated by § 2-712.

We shall modify the judgment to credit Miller with the "handling charge" and remand the case in order that Miller may be given an opportunity to prove such damages as may be recoverable under Art. 95B, *see* Comment 4 to § 2-715.

> *Judgment against Fred J. Miller, Inc. modified by reducing the amount from $3,369.60 to $3,237.00 and as modified, affirmed; judgment in favor of Raymond Metal Products Company on counterclaim reversed, and case remanded for evidentiary hearing on damages; costs on appeal to be equally divided between appellant and appellee.*