# ADDRESSOGRAPH-MULTIGRAPH CORPORATION *v.* ZINK'ET UX.

[No. 66, September Term. 1974.]

*Decided December 4, 1974.*

*Motion for rehearing filed January 2, 1975; denied January 8, 1975.*

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and O'DONNELL, JJ.

*Daniel H. Scherr* and *Terry B. Blair,* with whom were *Sybert, Sybert & Nippard* on the brief, for appellant.

*Millard D. Bloom* for appellees.

SINGLEY, J., delivered the opinion of the Court.

In February, 1970, George Zink, trading as Peacock Printing Company, leased from C.I.T. Leasing Corporation (C.I.T.) a VariTyper, a Headliner and a Waxer, all manufactured by VariTyper Corporation, then a subsidiary, and now a division, of Addressograph-Multigraph Corporation (Addressograph). The equipment, purchased at an unspecified date from Addressograph by C.I.T., had been delivered to Zink's printing plant in late December, 1969, where it had been serviced by Addressograph.

Zink's lease with C.I.T., which was for a term of five years, called for an advance payment of five monthly installments (the first and the last four) of $193.86 each, or $969.30, and the payment of the remaining 55 installments at monthly intervals commencing 30 days after delivery of the equipment. Under a separate agreement, Zink and his wife guaranteed the payment of the rent reserved under the lease.

Zink made the required monthly payments through

September, 1971, at which time there was an unpaid balance of $6,978.99. Thereafter, he made no further payments. In February, 1972, C.I.T. repossessed the leased equipment and then sold it for $3,500.00. Later, C.I.T. brought suit in the Circuit Court for Howard County against Zink and his wife on their agreement of guaranty.

The Zinks countered with a third-party complaint against Addressograph, alleging that because the VariTyper equipment was defective and inoperable, any sum found to be due C.I.T. should be the subject of a judgment in their favor against Addressograph.

Addressograph pleaded the general issue, and the Zinks' third-party claim ultimately came on for trial, after a consent judgment had been entered in C.I.T.'s favor against the Zinks. The third-party action resulted in a judgment for $4,332.32 [1] and costs in the Zinks' favor against Addressograph, and this appeal followed.

In response to Addressograph's interrogatories, the Zinks had said that they were relying on Addressograph's express warranty, which they maintained had been breached by the failure of the equipment to operate properly after continuous service calls. The warranty, titled "Machine Warranty," was delivered to Zink with the equipment:

> "For a period of thirty days from date of invoice, the VariTyper Corporation agrees to render any normal mechanical repair service, such as adjustments, which may be required on all machines, without charge to purchaser and further guarantees for one year after date of invoice all new, demonstrator and factory rebuilt equipment it sells to be free of defects in material and workmanship, its obligation under the guarantee being limited to the correction of defective workmanship or the replacement of defective parts, not caused by misuse, accident or neglect."

---

1. This consisted of the unpaid balance of rent due under the lease, an attorney's fee provided for by the lease guaranty, and interest, less the amount realized when the equipment was sold.

Addressograph argues that there are three reasons why we should reverse the judgment entered below:

(i) The Zinks did not establish the privity with Addressograph necessary to enable them to recover on the Machine Warranty;

(ii) The Zinks did not sustain their burden of proving a breach of warranty;

(iii) Damages were improperly measured and assessed by the trial court.

(i)

The General Assembly, by enacting Chapter 249 of the Laws of 1969, has virtually eliminated the requirement of privity in actions for damages for *personal injury* grounded on breach of an express or implied warranty, *compare* Maryland Code (1957, 1964 Repl. Vol., 1974 Cum. Supp.) Art. 95B, Uniform Commercial Code (the UCC), § 2-318 *with Blankenship v. Morrison Machine Co.*, 255 Md. 241, 246-47, 257 A. 2d 430, 433 (1969) (which involved an injury sustained by an operator of a machine sold before § 2-318 was amended). Privity of contract remains an essential ingredient, however, in a breach of express warranty action not involving personal injury, because privity between the plaintiff and defendant is requisite to maintain a contract action unless the plaintiff is either a donee beneficiary or a creditor beneficiary, *Mackubin v. Curtiss-Wright Corp.*, 190 Md. 52, 56, 57 A. 2d 318, 321 (1948).

The trial court, quite properly, we think, treated this case as an action for damages for breach of an express warranty. That the equipment was delivered to Zink where it was serviced by Addressograph is significant. Equally significant was the delivery of Addressograph's Machine Warranty to Zink. Most compelling of all was the testimony of William T. Wells, service manager for Addressograph, that the numerous service calls made between December, 1969 and July of 1971 were made without charge, as a consequence of Addressograph's having voluntarily extended the 30-day guaranty period because the VariTyper

would not stay in adjustment.[2] Under the facts of this case we are satisfied that Addressograph is estopped from denying Zink the benefits of the express warranty. In this connection, we observe that the sale to C.I.T. and the lease to Zink more than a month after the delivery and installation of the equipment may well have been a financing mechanism,[3] although the record is silent as regards this.

It seems to us that even assuming that there was no privity between Zink and Addressograph, Addressograph, by its course of conduct is now equitably estopped from asserting lack of privity as a defense, or, in the language of *Benson v. Borden*, 174 Md. 202, 219, 198 A. 419, 427 (1938) is inhibited from asserting lack of privity as a defense "from the mischief that has followed [its acts]." The mischief here is that for about a year and a half Addressograph faithfully, if unsuccessfully, performed its obligations under the guaranty contained in the Machine Warranty. Zink was led to believe that he could rely on the warranty, as in fact, he did, when he employed an operator at $80.00 a week, who remained on the payroll with no duties to perform on the many occasions when the equipment was not usable.

3 J. Pomeroy, Equity Jurisprudence § 804, at 189 (5th ed. 1941) defines equitable estoppel as follows:

> ". . . Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, of contract, or of remedy, as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse,

---

**2.** In July, 1971, Zink agreed to enter into a service contract with Addressograph. Service calls were made well into October or November, 1971, after Zink had stopped his payments to C.I.T. It would seem that Zink made ro payments to Addressograph under the service contract.

**3.** The lease, which was not executed until nearly two months after the equipment was delivered, provided that Zink could purchase the equipment at the end of the lease term for $1.00.

and who on his part acquires some corresponding right, either of property, of contract, or of remedy."

*See also Benson v. Borden, supra,* 174 Md. at 218 quoting Sir James Fitzjames Stephen, Digest of the Law of Evidence, at 124; 28 Am.Jur.2d *Estoppel and Waiver* § 35, at 640-42 (1966).

While *Food Fair Stores, Inc. v. Blumberg,* 234 Md. 521, 200 A. 2d 166 (1964) is frequently cited for the proposition that a contract cannot be created by estoppel, this statement is overly broad, and is true only in the absence of injury or prejudice, *United States v. McCay,* 28 F. 2d 777 (D. Md. 1928). We think the rule is better stated by Judge Oppenheimer, for the Court, in *Travelers Indemnity Co. v. Nationwide Construction Corp.,* 244 Md. 401, 414, 224 A. 2d 285, 292 (1966):

> "We have repeatedly stated that whether or not an estoppel exists is a question of fact to be determined in each case. *Gould v. Transamerican Associates, supra,* at 224 Md. 297; *Liberty Mut. Ins. Co. v. American Auto. Ins. Co.,* 220 Md. 497, 501, 154 A. 2d 826 (1959); and cases therein cited. Wrongful or unconscientious conduct on which the other party relies, to his detriment, is generally an element of estoppel in the particular circumstances, see *Liberty Mut. Ins. Co. v. American Auto. Ins. Co.,* 220 Md. at 500, but an estoppel may arise even when there is no intent to mislead, if the acts of one party cause a prejudicial change in the conduct of the other. *Harrison v. McCarty,* 178 Md. 377, 13 A. 2d 544 (1940) . . . ."

We think that this case is analogous to *Harrison v. McCarty, supra,* cited by Judge Oppenheimer. There, an injured employee was taken to a physician by his employer. The employer told the employee "to carry out the doctor's orders" and that "a report would be made." When claim was made for Workmen's Compensation nearly two years after

the accident, the insurer pleaded limitations. The Court held, at 380-81 of 178 Maryland:

"Everybody concerned agrees that this is a meritorious case, and that the defence is strictly technical. There is not even a suggestion or suspicion that a fraud was intended or attempted on the claimant to induce him to refrain from filing a claim within the statutory period. He thought from the day after his accident that his claim had been filed, and inferred from Dr. Hammond's remark that it would probably be a year before he could know the extent of his injury. His employer told him to do what Dr. Hammond told him, and in the year he went to his physician for an examination, and then, on consulting an attorney, learned, to his surprise, that he had no claim pending. It appears to this court that, under these circumstances, the employer is estopped to raise the issue of limitations and this estoppel will be imputed to the insurer, which appears here resisting this claim."

Here, Zink was led to believe, to his detriment, that the equipment was covered by the Machine Warranty, and could be made to operate satisfactorily. Having performed under the agreement, Addressograph cannot, under the facts of this case, now assert a lack of privity as a defense.

(ii)

We think, as did Judge Mayfield, who tried the case below, that the Zinks sustained their burden of proof. A strong inference can be drawn from Wells' testimony that the unacceptable performance was attributable to the fact that the VariTyper would not hold adjustments. That this defect was critical is apparent. Zink testified that he wanted the equipment to reduce charges for composing, which he was having done by others. The VariTyper equipment was bought so that copy with justified margins could be produced for purposes of offset printing. When copy with

uneven margins and erratic spacing resulted, it was necessary to resort constantly to outside composition companies until repairs could be made. Zink produced bills showing that some $2,500.00 had been spent for this purpose.

While the principal operating problem was with the VariTyper itself, it seems to us that Judge Mayfield was quite right when he found that Zink had purchased a "package." Of the three pieces of equipment, Zink testified that the Headliner was used to reproduce type faces of a size larger than was the VariTyper's capability, and that the Waxer was used in the operation of both machines. There was no proof that the Headliner could be put to any practical use in Zink's plant without the VariTyper, or that the Waxer was of any use without the VariTyper.

## (iii)

Addressograph complains that the proper measure of damages for breach of warranty is the difference between the value of the goods delivered and the value of the goods as warranted, relying on UCC § 2-714 (2). Section 2-714 in its entirety provides:

> "Buyer's damages for breach in regard to accepted goods.
>
> "(1) Where the buyer has accepted goods and given notification (subsection (3) of § 2-607) he may recover as damages for any non-conformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.
>
> "(2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.
>
> "(3) In a proper case any incidental and consequential damages under the next section may also be recovered."

*See Fred J. Miller, Inc. v. Raymond Co.*, 265 Md. 523, 528-29, 290 A. 2d 527, 530 (1972) (controlled by the UCC); *Correlli Roofing Co. v. National Instrument Co.*, 240 Md. 627, 634, 214 A. 2d 919, 922 (1965) (applying contract law). This, however, is not the only recovery possible. The Zinks were entitled to keep the goods and seek incidental and consequential damages as well, provided Addressograph was given, as it was, the reasonable notice of the defect required by UCC § 2-607 (3) (a), *compare Rittenhouse, Winterson Auto. Co. v. Kissner*, 129 Md. 102, 111, 98 A. 361, 364 (1916), construing Code (1911) Art. 83, § 70, a similar provision contained in the Uniform Sales Act.

The allowance of incidental and consequential damages for breach of warranty is provided for by UCC § 2-715:

"Buyer's incidental and consequential damages.

"(1) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.

"(2) Consequential damages resulting from the seller's breach include

"(a) Any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and

"(b) Injury to person or property proximately resulting from any breach of warranty."

*See Fred J. Miller, Inc. v. Raymond Co., supra*, 265 Md. at 528; *W & W Livestock Enterprises, Inc. v. Dennler*, 179 N.W.2d 484 (Iowa, 1970); 2 R. Anderson, Uniform Commercial Code §§ 2-715:15-16, at 472-73 (2d ed. 1971); 1 W. Hawkland, A Transactional Guide to the Uniform

Commercial Code §§ 1.510101-.510102, at 266-68; C. McCormick, Handbook on the Law of Damages § 176, at 672-75 (1935).

The allowance of incidental and consequential damages for breach of warranty finds its genesis in the rule of *Hadley v. Baxendale*, 9 Exch. 341 (1854)[4] that damages which a plaintiff may recover for breach of contract include both those which may fairly and reasonably be considered as arising naturally from the breach (general damages) and those which may reasonably be supposed to have been in the contemplation of both parties at the time of making of the contract (special damages). *See Taylor v. Equitable Trust Co.*, 269 Md. 149, 159, 304 A. 2d 838, 844 (1973); *St. Paul at Chase v. Manufacturers Life Ins. Co.*, 262 Md. 192, 239-40, 278 A. 2d 12, 35 (1971); *Pennsylvania Threshermen & Farmers' Mut. Cas. Ins. Co. v. Messenger*, 181 Md. 295, 300-01, 29 A. 2d 653, 656 (1943); 5 A. Corbin, Contracts § 1011, at 83-87, § 1101, at 543-46 (1964); 11 S. Williston, Contracts § 1393, at 448-53 (3d ed. 1968).

Restatement of Contracts § 330 (1932) provides:

> "In awarding damages, compensation is given for only those injuries that the defendant has reason to foresee as a probable result of his breach when the contract was made. If the injury is one that follows the breach in the usual course of events, there is sufficient reason for the defendant to foresee it; otherwise, it must be shown specifically that the defendant had reason to know the facts and to foresee the injury."

Similar relief was available under the Uniform Sales Act, where special damages could be recovered for breach of warranty, even though the contract had been rescinded, *Russo v. Hochschild Kohn & Co.*, 184 Md. 462, 467, 41 A. 2d 600, 602 (1945).

---

4. Hadley v. Baxendale, 9 Exch. 341 (1854), has been followed in Maryland since the opinion in United States Telegraph Co. v. Gildersleve, 29 Md. 232, 249-51 (1868).

Since the same result obtains as a matter of contract law, we find it unnecessary to determine whether the Zinks can rest their case on the UCC. A persuasive case on the issue of damages is *Fairchild Stratos Corp. v. Siegler Corp.*, 225 F. Supp. 135 (D. Md. 1963), applying Maryland law. There, Fairchild had contracted with one of Siegler's divisions for the design and fabrication of a stretch press to be used for the manufacture of aluminum boat hulls. The contract price, as finally arrived at by the parties, was $288,755.26. Siegler had guaranteed that the press would produce boat hulls at the rate of 10 halves per hour, a production capability which Siegler was unable to demonstrate. Fairchild rescinded the contract and sought damages for breach of warranty.

Relying on *Hadley v. Baxendale, supra,* and the Maryland cases, the court concluded that Fairchild was entitled to recover not only payments made on account of the purchase price of the press, in an amount of $216,872.26, but also for damages for any loss directly and naturally resulting from the breach of warranty, or reasonably within the contemplation of the parties as a probable result of a breach at the time the contract was made. The court found that these aggregated $168,079.02, and included: the cost incurred in constructing a foundation for the press; the value of aluminum sheets used; the cost of items supplied and the amount of employees' salaries incurred in an unsuccessful attempt to operate the machine; the estimated cost of restoring Fairchild's plant to the condition which existed prior to the installation of the press, as well as travel expense incurred in exhibiting prototypes and damages paid to boat distributors, whose contracts were necessarily terminated.

In justifying the award, the court recognized that all of these damages were within the contemplation of the parties, should a breach occur. Siegler knew that Fairchild had no prior experience in the fabrication of boats; knew that modification of Fairchild's plant would be required; knew that materials would be expended, and Fairchild employees utilized in testing the machine, and knew, too, that a

program of promoting the product and enlisting distributors would be undertaken before production commenced. This brought the case within the second prong of the rule in *Hadley v. Baxendale, supra.*

Here, for reasons not clear to us, Zink chose not to recover the difference between the value of the equipment as delivered, and the price of the equipment as warranted, together with any expense to which he may have been put. Instead, Zink and his wife claimed, as consequential damage, only the amount that they were forced to pay C.I.T. under the guaranty.

The possibility that Zink might have claimed a greater sum: *i.e.,* the entire amount paid C.I.T. less the price for which the equipment was sold by C.I.T., does not preclude the recovery of a lesser sum. The fact that C.I.T. expected to receive the payments reserved under the lease and its right to enforce the guaranty in the event of default were known to Addressograph from the beginning, when Addressograph sold the equipment to C.I.T. and assumed responsibility for it at Zink's plant. There are cases which recognize the possible recovery of finance charges incurred in the purchase of goods when a warranty is breached, if the seller knows of the arrangement at the time of the contract, *Lee v. Blanchard,* 264 So.2d 364 (La. App. 1972); *Mendoyoma, Inc. v. County of Mendocino,* 8 Cal.App.3d 873, 87 Cal. Rptr. 740 (1970). Because Addressograph was unable, during a period of 22 months, to make the VariTyper work properly, and was unwilling to accede to Zink's requests that it be replaced, there was clearly a breach of the Machine Warranty. It was Zink's attempt to rescind the C.I.T. lease (an unsuccessful one, because the C.I.T. lease negated all warranties by C.I.T.) which occasioned the enforcement of the guaranty agreement.

As regards Addressograph's contention that the amount of the judgment was improper because it included a $330.33 counsel fee paid to counsel for C.I.T., Addressograph is right in its contention that the successful party in a lawsuit ordinarily cannot recover legal fees. The result is otherwise,

however, when the payment is provided for by contract, as it was in the C.I.T. lease and the agreement of guaranty, *Empire Realty Co. v. Fleisher*, 269 Md. 278, 286, 305 A. 2d 144, 148 (1973); *Webster v. People's Loan, Savings & Deposit Bank*, 160 Md. 57, 61, 152 A. 815, 817 (1931).

*Judgment affirmed, costs to be paid by appellant.*