**UNPUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

ISAIAH BONGAM,

      *Plaintiff-Appellant,*

    v.

ACTION TOYOTA, INCORPORATED, t/a
Darcars Toyota; MARCO MARCATILI,
Previously named as John Doe,
Manager,

      *Defendants-Appellees,*

    and

DARCARS, INCORPORATED, a/k/a
Mariam, Incorporated; JOHN DOE,
Manager May 22, 1996, Darcars
Toyota,

      *Defendants.*

No. 00-1241

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Joseph Robert Goodwin, District Judge,
sitting by designation.
(CA-97-2072-WMN)

Argued: June 4, 2001

Decided: August 1, 2001

Before LUTTIG, WILLIAMS, and MICHAEL, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Steven Jeffrey Silverberg, Washington, D.C., for Appellant. Samuel J. DeBlasis, II, DECARO, DORAN, SICILIANO, GALLAGHER & DEBLASIS, L.L.P., Lanham, Maryland, for Appellees.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

**OPINION**

PER CURIAM:

After Action Toyota, Inc.[1] and Marco Marcatili (collectively, Appellees) failed to sell Isaiah Bongam a Toyota 4-Runner for which he had contracted, Bongam filed this action seeking damages for breach of contract; discrimination based on race, color, and national origin in violation of 42 U.S.C.A. § 1981 (West 1994) and Maryland state and local law provisions; and intentional infliction of emotional distress (IIED). Before trial, the district court granted summary judgment to Appellees on Bongam's IIED claim. The district court granted Appellees' motion for judgment as a matter of law as to Bongam's request for consequential damages, as part of his breach of contract claim, at the end of Bongam's case and granted Appellees' renewed motion for judgment as a matter of law as to Bongam's civil rights claims at the end of Appellees' case. The breach of contract claim went to the jury, and the jury returned a verdict in favor of Bongam and awarded him $5,370. Bongam now appeals the judgment of the district court in several respects. Finding no reversible error, we affirm.

---

[1]Action Toyota, Inc. trades as DARCARS Toyota and will be referred to as "DARCARS" throughout this opinion.

## I.

Bongam, a black man, is a citizen of Cameroon.[2] In Cameroon, he is chief of his village, which has about 10,000 residents. In addition to his duties as chief, Bongam owns and operates a construction company in Cameroon. On May 20, 1996, Bongam went to DARCARS in Silver Spring, Maryland seeking to purchase a four wheel drive Toyota 4-Runner with a manual transmission. DARCARS had a 4-Runner meeting Bongam's specifications, and Bongam entered into negotiations with Philip Gyau, a DARCARS salesman, to purchase the 4-Runner.

Gyau initially informed Bongam that the vehicle's price was over $26,000. Bongam made a counteroffer of $23,000. After haggling with Bongam, Gyau, who as a salesman was not authorized to make pricing decisions without approval from a superior, asked that Charles Tokem, a Cameroon native, take over negotiations. Tokem got Bongam to raise his offer, but Marcatili, the General Sales Manager,[3] still was not satisfied with Bongam's offer. As a result, Hassan, a DARCARS "team captain," was brought into the negotiations. Hassan negotiated with Bongam, and they reached an agreement under which Bongam would pay $25,000 for the vehicle.[4] Bongam wanted to take

---

[2]Because we review the district court's entries of judgment as a matter of law and summary judgment de novo, we recite the facts in the light most favorable to Bongam. Appellees, however, dispute much of Bongam's version of the facts. Appellees do not dispute on appeal, regardless of Marcatili's subjective belief, that a contract actually existed between DARCARS and Bongam. (*See* J.A. at 668 (noting jury's finding that DARCARS "entered into and breached a contract with Isaiah Bongam" and that the damages, "represent[ing] the difference . . . between the contract price of the vehicle and the fair market value of the vehicle," were $5,370).)

[3]Marcatili testified that, in his capacity as the General Sales Manager, his duties included supervising the sales managers, salespeople, and the Financial Services Manager.

[4]Bongam testified that $25,000 was the total purchase price. Because he was taking the car outside of the United States, he did not have to pay taxes or title and tag fees. Appellees presented evidence that a dispute existed over whether Bongam would pay the standard freight charge, in addition to the $25,000 purchase price, that is included in the price of every new vehicle. Because Bongam disputes this and we must take the evidence in the light must favorable to him, we assume that the $25,000 purchase price agreed upon by the parties was all inclusive.

possession of the vehicle that day, but was told that he could not take the car home because certain documents first had to be prepared and Bongam did not have the full amount with him in cash. Gyau, however, requested that Bongam make a deposit to show that his offer was serious, and Bongam put down a $10,000 deposit on the vehicle.[5] Bongam was to return in two days with the remainder of the purchase price. Gyau then placed a "Sold" sign on the vehicle. Bongam testified that, during the negotiations, he informed Gyau that he needed the vehicle for a project in Cameroon.

At some point on May 22, before Bongam arrived to pick up the vehicle another salesman, Janci Rivas, told Gyau "I am selling your car" and that the couple buying the car was already in the financing department. (J.A. at 458.) The deal was approved by the manager on duty,[6] and the car was sold to a Hispanic couple for $30,370 plus taxes, tag and title, and service fees, or over $5,000 more than Bongam had offered.

Shortly thereafter, Bongam returned to DARCARS. Upon arriving, Bongam saw Gyau, told him that he was there to pick up his vehicle, and gave him a check for the remainder of the purchase price. Gyau took Bongam to see Marcatili. After Gyau handed Marcatili the check, Marcatili told Bongam that Bongam's vehicle would be ready in a few minutes. After waiting for more than thirty minutes, Bongam told Marcatili, "I have been waiting for long, please, can you give me my car and let me go ?" (J.A. at 324.) Marcatili responded, "Nigger, you can go, I sold this car, go anywhere you want." (J.A. at 324.) Marcatili then turned and went into his office.

After Bongam complained to DARCARS's owner about the incident, DARCARS offered to sell him another vehicle. Although DARCARS did not offer to sell Bongam the same 4-Runner that he had

---

[5]Although Gyau requested the deposit, Bongam determined the amount of the deposit.

[6]Marcatili testified without contradiction that he was not the manager to open on May 22, that there was another manager in charge that morning, and that the other manager sold the vehicle to the Hispanic couple. Marcatili further testified that he was not involved at all in negotiating the deal to sell the Hispanic couple the vehicle.

attempted to buy earlier (because it had already been sold to the Hispanic couple), it did attempt "to replace the car." (J.A. at 339.) Bongam, however, only was willing to accept another 4-Runner if it had a manual transmission, and DARCARS did not have such a vehicle.

II.

On June 27, 1997, Bongam filed a complaint initiating this action in the United States District Court for the District of Maryland. On September 16, 1998, Bongam filed an amended complaint alleging breach of contract; discrimination based on race, color, and national origin in violation of 42 U.S.C.A. § 1981, Article 49B of the Annotated Code of Maryland, and Chapter 27 of the Montgomery County Code; and IIED. On January 18, 2000, jury trial proceedings began. Prior to impaneling the jury, the district court granted summary judgment to Appellees on Bongam's IIED claim. At the close of Bongam's case, Appellees made a motion for judgment as a matter of law as to the remaining counts. The district court ruled that "the question of the existence of a contract is and remains a question of fact for the jury." (J.A. at 554.) The district court, however, granted the motion insofar as it challenged Bongam's claim for consequential damages. The district court also denied Appellees' motion for judgment as a matter of law as to Bongam's civil rights claims.[7] Appellees renewed their motion for judgment as a matter of law as to the civil rights claims at the end of their case. The district court granted the motion, leaving only Bongam's breach of contract claim for resolution by the jury. On January 24, 2000, the jury returned a verdict in favor of Bon-

---

[7]In the district court, Bongam "lumped [his civil rights claims] all together into the racial discrimination action." (J.A. at 530.) Like the district court, we will treat these three counts as one for purposes of our analysis, because Maryland Code Ann. Art. 49B, § 42 (which incorporates the anti-discrimination provisions of the Montgomery County Code) is "substantively similar" to federal anti-discrimination law. *Magee v. Dansources Tech. Serv., Inc.*, 769 A.2d 231, 243 (Md. App. 2001); *see also Parlato v. Abott Lab.*, 850 F.2d 203, 205-06 n.6 (4th Cir. 1988) ("[T]he public policies expressed in Article 49B are in substance duplicative of the policies expressed in its federal counterparts."). Bongam makes no argument that the claims based upon state and local code provisions remain if his federal claim is denied.

gam for $5,370, representing "the difference . . . between the contract price of the vehicle and the fair market value of the vehicle." (J.A. at 668.) On February 18, 2000, Bongam filed a notice of appeal.

On appeal, Bongam claims that the district court erred in granting Appellees' motions for judgment as a matter of law as to Bongam's claim for consequential damages and his civil rights claims and in granting summary judgment to Appellees on his IIED claim. Bongam also claims that the district court erred when it refused to allow a witness called by Bongam to testify as an expert and when it ruled that it would not continue the trial to allow a witness to arrive who was delayed in transit in France after his green card was stolen. We address each issue in turn.

### III. *Civil Rights Claims*

Section 1981 provides in pertinent part that "[a]ll persons . . . shall have the same right to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C.A. § 1981(a). To prevail on a § 1981 claim, a plaintiff "must prove purposeful discrimination." *Patterson v. McLean Credit Union*, 491 U.S. 164, 186 (1989). "Typically, most litigation involving § 1981 claims has emanated from the right to make and enforce employment contracts." *Hampton v. Dillard Dept. Stores, Inc.*, 247 F.3d 1091, 1102 (10th Cir. 2001). "However, the statute has been applied [to discrimination claims arising] in the retail sector." *Id.* To establish a prima facie case under § 1981, the plaintiff must show (1) that he "is a member of a protected class"; (2) "that the defendant had the intent to discriminate [against him] on the basis of race"; and (3) that the discrimination interfered with his right to contract. *Id.*

We review de novo the district court's grant of Appellees' motion for judgment as a matter of law, construing "the evidence in the light most favorable to the party against whom the motion was made." *Anderson v. Russell*, 247 F.3d 125, 129 (4th Cir. 2001). Judgment as a matter of law is appropriate during a jury trial when a party "has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue."[8]

---

[8]The standard for judgment as a matter of law under Federal Rule of Civil Procedure 50(a) mirrors the standard for summary judgment under Federal Rule of Civil Procedure 56. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

Fed. R. Civ. P. 50(a). In other words, a mere scintilla of evidence introduced by the party having the burden of proof is not enough to avoid the entry of judgment as a matter of law. Instead, "before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986) (internal quotation marks omitted). The party bearing the burden of proof must produce genuine evidence that creates a fair doubt; "wholly speculative assertions will not suffice." *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir. 1985), *overruled on other grounds by Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989).

Our inquiry here focuses on whether Appellees had the intent to discriminate against Bongam on the basis of his race, and whether that discrimination, if established, interfered with his right to contract. *Hampton*, 247 F.3d at 1102. Bongam points to the following evidence to support his claim that Appellees intentionally discriminated against him on the basis of his race: (1) Gyau testified that the sales staff at DARCARS drove harder bargains with black and Hispanic customers than they did with whites, "Chinese," and "Indians" to obtain a higher price from people the sales staff perceived to be less informed, (J.A. at 464-67); (2) Marcatili told Bongam "Nigger, you can go, I sold this car, go anywhere you want," (J.A. at 324); and (3) Gyau testified that he thought that "from the way things went at the dealership, if it was a white gentleman that left [the deposit], I think we would have held the car," (J.A. at 494). We agree with the district court that this evidence, if assumed to be true, describes conduct that is reprehensible and condemnable. It does not, however, demonstrate that the alleged discriminatory conduct interfered with Bongam's right to contract under § 1981 on the basis of Bongam's race.

First, the evidence that Appellees drove harder bargains with people they believed to be less informed, while evidence of an alleged discriminatory atmosphere at DARCARS, does not show that Appellees interfered with Bongam's right to contract because of his race. Appellees agreed to sell Bongam the vehicle for $25,000, more than $1,000 less than the sticker price in excess of $26,000, and substantially less than the $30,370 plus taxes, tag and title, and service fees

for which the vehicle was ultimately sold. Thus, the evidence indicates that Bongam, whom Appellees knew to be black,[9] was offered the vehicle for less than the sticker price, and the contract was not breached until someone else — also a member of a group allegedly treated differently from whites, Asians, and Indians in negotiations — made an offer more than twenty percent higher than Bongam's. Moreover, Bongam does not argue that Appellees discriminated against him in the negotiations leading up to his agreement to pay $25,000 for the vehicle. Thus, although this evidence arguably demonstrates intentional discrimination, it does not demonstrate that the discrimination interfered with Bongam's right to contract.

With respect to Marcatili's alleged racist remark, the remark was not made until *after* the sale of the vehicle to the Hispanic couple — for more than $5,000 above the price which Bongam agreed to pay — had been approved by another manager. Other than a temporal relation, "no nexus exists between the alleged discriminatory statement" and the decision to sell the vehicle to the subsequent purchaser. *EEOC v. Clay Printing Co.*, 955 F.2d 936, 952 (4th Cir. 1992). Indeed, Marcatili initially had approved the sale of the vehicle to Bongam. *Cf. Proud v. Stone*, 945 F.2d 796, 797 (4th Cir. 1991) ("[I]n cases where the hirer and firer are the same individual and the termination of employment occurs within a relatively short time span following the hiring, a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer."). Finally, Gyau's speculation that "from the way things went at the dealership, if it was a white gentleman that left [the deposit], I think we would have held the car," (J.A. at 494), was not linked to any incident in which a vehicle was held for a white person after the white person put down a deposit and someone else subsequently offered more money for the vehicle. More importantly, Gyau pointed to nothing in the course of Appellees' dealings with Bongam that led him to this conclusion. In fact, Gyau testified, when specifically asked, that he did not know why Appellees did not sell the vehicle to Bongam. Gyau testified, in response to the question "Isn't it true . . . that the fact that Mr. Bongam didn't get the car had nothing to do with his color?" that "I wouldn't know that . . . . I wouldn't know what [Marcatili] was thinking." (J.A. at 475.) Gyau's specula-

---

[9]Marcatili testified that he dealt directly with Bongam on May 20.

tive testimony is not probative evidence sufficient to withstand a motion for judgment as a matter of law. *See, e.g., Greensboro Prof'l Fire Fighters Ass'n v. City of Greensboro*, 64 F.3d 962, 967 (4th Cir. 1995) (noting that "purely speculative" evidence was "flawed" and thus was not "probative evidence" supporting claims against the city under 42 U.S.C.A. § 1983); *Ross*, 759 F.2d at 364 (noting that "wholly speculative assertions" do not create a genuine issue of fact sufficient to withstand a motion for summary judgment).

We conclude that an insufficient evidentiary basis exists for a reasonable jury to find that the discriminatory conduct alleged interfered with Bongam's right to contract under § 1981. *Hampton*, 247 F.3d at 1102. We therefore hold that the district court properly granted Appellees' motion for judgment as a matter of law.

## IV. *Consequential Damages*

Bongam also claims that the district court erred in granting Appellees' motion for judgment as a matter of law on Bongam's contract claim for consequential damages. As stated earlier, we review de novo the district court's grant of Appellees' motion for judgment as a matter of law and construe "the evidence in the light most favorable to the party against whom the motion was made." *Anderson v. Russell*, 247 F.3d 125, 129 (4th Cir. 2001).

The award of consequential damages resulting from the breach of a contract in Maryland is governed by Maryland Code Annotated, Commercial Law § 2-715(2)(a). Section 2-715(2)(a) states that "[c]onsequential damages resulting from the seller's breach include . . . [a]ny loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise." Md. Code Ann., Com. Law I § 2-715(2)(a) (1997). The Maryland Courts have explained § 2-715, in the context of breach of warranty, as follows:

> The allowance of incidental and consequential damages . . . finds its genesis in the rule of *Hadley v. Baxendale*, that damages which a plaintiff may recover for breach of contract include both those which may fairly and reasonably be

considered as arising naturally from the breach (general damages) and those which may reasonably be supposed to have been in the contemplation of both parties at the time of making of the contract (special damages).

*Addressograph-Multigraph Corp. v. Zink*, 329 A.2d 28, 33-34 (Md. 1974) (internal citations omitted).

Bongam claims that he "lost an amount up to, and including" $50 million because Appellees did not sell him the manual transmission, four wheel drive Toyota 4-Runner. (Appellant's Br. at 23.) These extraordinary damages, Bongam claims, result from the cancellation of a contract that Bongam's construction company had with the Cameroonian government to build a school. Specifically, Bongam claims that the contract was canceled because he could not access the job site because he did not receive the vehicle that he attempted to buy from Appellees' and that a Toyota 4-Runner with a "manual shift" was the "only vehicle that would ply that road." (J.A. at 291.) As a result of the cancellation of the contract, Bongam claims that his "reputation was ruined," (J.A. at 350), that he would be prevented from contracting with the Cameroonian government for five years, and consequently his net worth dropped from $60 million to $10 million.

For the purpose of our analysis, we must determine whether Appellees, at the time that they breached the contract, had reason to know that such damages would be the natural and probable result of their breach. *See* Md. Code Ann., Com. Law I § 2-715(2)(a) (1997); *Addressograph-Multigraph*, 329 A.2d at 33-34. The Maryland Code also provides that the breaching party is liable only for those damages "which could not reasonably be prevented by cover or otherwise" by the non-breaching party. Md. Code Ann., Com. Law I § 2-715(2)(a) (1997). Thus, the focus is not on what allegedly happened but on whether Appellees reasonably could have foreseen Bongam's alleged damages and whether Bongam could have prevented them. The evidence reflects that Bongam told Gyau that he "had a contract and it was almost suffering from cancellation if [he] didn't have this car." (J.A. at 306.) Bongam further testified that he told Gyau "I have a contract where I am supposed to execute and this car has been keeping this contract for more than six months I cannot operate there

because if I don't have this car I would not have access with my material to the site." (J.A. at 307.)

While Bongam may have believed that the manual transmission Toyota 4-Runner was the best vehicle to do the job, it strains credulity to believe that no other vehicle would have been an acceptable, if not perfect, substitute. Bongam failed to show that it was within Appellees' contemplation that Bongam would not be able to find *any* manual transmission, four wheel drive vehicle to complete the project. Moreover, the district court correctly noted that Bongam had not presented specific evidence regarding how his damages arose out of his own breach of the construction contract. We hold, therefore, that the district court correctly granted Appellees' motion for judgment as a matter of law because no reasonable jury could conclude from this evidence that Appellees were on notice that Bongam would lose $50 million if he did not receive the precise vehicle for which he bargained or that Bongam could not have reasonably prevented this loss "by cover or otherwise." Md. Code Ann., Com. Law I § 2-715(2)(a) (1997).

## V. *Intentional Infliction of Emotional Distress Claim*

Bongam next claims that the district court erred when it granted summary judgment to Appellees on Bongam's IIED claim.[10] We review the district court's grant of summary judgment de novo. *Evans v. Tech. App. & Serv. Co.*, 80 F.3d 954, 958 (4th Cir. 1996). Summary judgment is appropriate when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *Hughes v. Bedsole*, 48 F.3d 1376, 1381 (4th Cir. 1995).

The elements of an IIED claim in Maryland are: "(1) The conduct

---

[10]Bongam suggests that we should review the entry of judgment for Appellees on this claim under the standards applicable to a Federal Rule of Civil Procedure 12(b)(6) motion. We disagree, noting that the district court considered matters outside of the pleading before entering judgment. Accordingly, this issue will be reviewed under the standards applicable to summary judgment. *See* Fed. R. Civ. P. 12(b) (noting that when "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment").

must be intentional or reckless; (2) The conduct must be extreme and outrageous; (3) There must be a causal connection between the wrongful conduct and the emotional distress; (4) The emotional distress must be severe." *Harris v. Jones*, 380 A.2d 611, 613 (Md. 1977). The Maryland courts have made it clear that "recovery [for IIED] will be meted out sparingly, its balm reserved for those wounds that are truly severe and incapable of healing themselves." *Figueiredo-Torres v. Nickel*, 584 A.2d 69, 75 (Md. 1991). Moreover, "[t]he conduct must strike to the very core of one's being, threatening to shatter the frame upon which one's emotional fabric is hung." *Hamilton v. Ford Motor Credit Co.*, 502 A.2d 1057, 1064 (1986). "It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as extreme and outrageous." *Harris*, 380 A.2d at 615.

While the term "nigger" is an "unambiguously racial epithet" that "is pure anathema" to blacks, *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 (4th Cir. 2001), Marcatili's alleged conduct was not sufficiently extreme and outrageous as to constitute IIED. However reprehensible we find the conduct, liability under Maryland law does not extend "to mere insults, indignities, [or] threats." *Harris*, 380 A.2d at 614 (internal quotation marks omitted). Marcatili's single alleged utterance of the slur, standing alone, is not the sort of "major outrage . . . essential to the tort" of IIED. *Id.* Therefore, we affirm the district court's entry of summary judgment in favor of Appellees on this issue.

## VI. *Expert Testimony*

Bongam argues that the district court erred when it excluded certain expert testimony concerning government contracting in Cameroon proffered by Bongam in the form of the testimony of George Achu, a former Cameroonian government official. "It is well-settled that decisions regarding the admission and exclusion of evidence are peculiarly within the province of the district court" and will not "be reversed on appeal absent an abuse of discretion." *See Martin v. Deiriggi*, 985 F.2d 129, 137 (4th Cir. 1992).

At trial, although the district court allowed Achu to testify about the condition of the roads in Cameroon, it refused to allow Achu to

testify as an expert regarding the consequences of breaching a contract with the Cameroonian government because it was not "foreseeable that as a direct result of this failure by the dealership to sell Mr. Bongam the vehicle that he would lose millions of dollars on a construction contract, that it would cause a default, and that he would lose all of this money." (J.A. at 508.) The same absence of evidence linking the two events that properly kept the question of consequential damages from the jury also supports the district court's exercise of discretion in deciding to limit Achu's testimony. Without a reasonable nexus between Appellees' breach of the sales contract and Bongam's breach of the government contract, notwithstanding whether Achu qualified as an expert on Cameroonian government contracts, Achu's testimony was not relevant to the breach of the sales contract at issue. *See* Fed. R. Evid. 401 (defining relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would without the evidence").[11] Accordingly, we cannot conclude that the district court abused its discretion in excluding this aspect of Achu's testimony.

VII. *Failure to Grant a Continuance*

Bongam's final argument is that the district court erred when it failed to grant a continuance that would have allowed a witness for Bongam, Jonathan Ngumdam, to testify. We review a district court's denial of a continuance for abuse of discretion. *Kosnoski v. Bruce*, 669 F.2d 944, 947 (4th Cir. 1982).

The record reflects that Ngumdam's green card was stolen in Paris and that his arrival in the United States was delayed by several days. In fact, Ngumdam, who was scheduled to arrive Monday night before the trial began on Tuesday, apparently was not available until Friday, the day the case went to the jury and two days after the last witness testified. In denying Bongam's request for a continuance, the district

---

[11]In his reply brief, Bongam states that the admissibility of the contract between Bongam and the Cameroonian government is not at issue on appeal. Therefore, to the extent that Bongam appears to challenge in his opening brief the district court's decision to exclude the contract from evidence, we consider that argument waived.

court noted that "throughout this entire trial, which was filed in 1997, counsel had the opportunity to develop the case." (J.A. at 629.)

The district court was well within its discretion in denying Bongam's motion for a continuance. Given the inherent uncertainties in international travel, Bongam's decision to schedule his witness to arrive on the eve of trial was daring, if not foolhardy. Moreover, Ngumdam's testimony, as summarized for the district court by Bongam's attorney, simply repeated testimony already offered at trial.[12] Accordingly, we conclude that the district court's denial of the continuance was neither an abuse of discretion nor prejudicial.

## VIII.

In conclusion, we hold that Bongam did not establish a legally sufficient evidentiary basis for determining that Appellees' failure to honor its contract to sell Bongam the Toyota 4-Runner was the result of discrimination based upon Bongam's race. Similarly, Bongam has not demonstrated that the district court erred by dismissing his consequential damages or IIED claims, or that the district court's evidentiary rulings were erroneous. The judgment of the district court is therefore affirmed.

*AFFIRMED*

---

[12]Bongam's attorney told the district court that Ngumdam "would have testified that he heard the racial slur. He would have testified that he was there when he saw the contract [between Appellees and Bongam] entered into, and that there was an agreement." (J.A. at 630.)